**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Abdul DAAS, a/k/a Abdual Daas, Defendant–Appellant.**

No. 98–10490.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 5, 1999.

Filed Dec. 30, 1999.

1168

David J. Cohen, Cohen & Paik, San Francisco, California, for the defendant-appellant.

Samantha S. Spangler, Assistant United States Attorney, Sacramento, California, for the plaintiff-appellee.

Before: SNEED and PREGERSON, Circuit Judges, and CARTER, District Judge.[1]

---

**1.** The Honorable David O. Carter, United States District Judge for the Central District of California, sitting by designation.

CARTER, District Judge:

Abdul Daas appeals his jury conviction and sentence for distributing listed chemicals, specifically ephedrine and pseudoephedrine, with reasonable cause to believe they would be used to manufacture methamphetamine in violation of 21 U.S.C. § 841(d)(2).[2]

Daas contends that (1) the evidence was insufficient to support his conviction because 21 U.S.C. § 841(d)(2) criminalizes the distribution of pure ephedrine or pseudoephedrine but not the distribution of a mixture, such as Mini Thins and Pseudo Thins, containing these chemicals; (2) the prosecutor improperly vouched for the credibility of its two witnesses who supplied the only direct evidence of Daas's culpable intent; (3) Daas's trial counsel was ineffective for failing to object to the prosecutor's allegedly improper remarks; (4) the district court improperly coerced the jury's guilty verdict by giving it a modified *Allen* charge after receiving a note that the jury was deadlocked; (5) the district court erred by refusing to entertain Daas's request for a downward departure based on the disparity in his sentence and the sentences received by the informants; (6) the district court erred by imposing a sentence enhancement for obstruction of justice; and (7) the district court improperly failed to exercise its discretion to depart downward on the ground the Daas's conduct reflected aberrant behavior.

We affirm the judgment of the district court, but we remand for further sentencing proceedings based on the disparity in Daas's sentence and the sentences received by the informants.

**FACTS**

Daas was a supplier of sundry items to various convenience stores in central California, including the Marysville area. Between early 1996 and early 1997, Daas sold to the All–Rite Market in Marysville a large quantity of cases of two over-the-counter decongestants, Mini Thins and Pseudo Thins. Mini Thins and Pseudo Thins contain ephedrine and pseudoephedrine, respectively. Because they are precursor chemicals used to manufacture methamphetamine, ephedrine and pseudoephedrine are each a "listed chemical" whose distribution is criminalized by 21 U.S.C. §§ 802(34)(C) & (K), 841(d)(2). Both Mini Thins and Pseudo Thins contain other ingredients and binders in addition to ephedrine and pseudoephedrine. Mini Thins also contain another active ingredient—specifically, guaifenesin (an expectorant).

Working undercover, Drug Enforcement Administration ("DEA") Special Agent Kenneth Wolters purchased Mini Thins from the All–Rite Market. Wolters arrested Makhan Bilkoo, the owner, and his employees Parupkar Bilkoo and Gurvinder Singh. The three identified Daas as one of their suppliers of Mini Thins and Pseudo Thins.

After these arrests, Parupkar Bilkoo met with Daas and twice surreptitiously recorded their conversations. During these conversations, Daas said a person has to be careful selling the product. He acknowledged having told Parupkar Bilkoo to put the Mini Thins in boxes and to sell them in large quantities only to repeat customers.

On November 29, 1997, Daas was indicted on one count of violating 21 U.S.C. § 841(d)(2) for distributing ephedrine and pseudoephedrine between February 12, 1996 and February 10, 1997.

The evidence at trial concerning whether Daas knew the Mini Thins were being used to make methamphetamine included:

---

2. The text of this provision is as follows:
 (d) Offenses involving listed chemicals
 Any person who knowingly or intentionally—
 . . .

 (2) possesses or distributes a listed chemical knowing, or having reasonable cause to believe, that the listed chemical will be used to manufacture a controlled substance . . . shall be fined . . . or imprisoned[.]

the taped conversations between Bilkoo and Daas; the testimony of the Bilkoos and Singh; documents from the Stanislaus County Drug Enforcement Agency and Mini–Thins supplier Body Dynamics Incorporated ("BDI"), which were retrieved from Daas's home pursuant to a search warrant; and Daas's own testimony.

Parupkar Bilkoo and Gurvinder Singh both testified that more than once they had met Daas in a parking lot to obtain Mini Thins. They testified that Daas knew Mini Thins and Pseudo Thins were used in the manufacture of methamphetamine. They also testified that Daas told them to be careful selling the products, not to sell to unknown customers, not to use the cash register or give receipts, and to conceal the products in other boxes or bags.[3]

A letter from the Stanislaus County Drug Enforcement Agency stated that ephedrine and pseudoephedrine products were being diverted for use in manufacturing methamphetamine. The BDI documents described the characteristics of suspicious transactions for these products, one of which was larger-than-normal shipments.

Further evidence at trial included various receipts and cancelled checks evidencing the Bilkoos' purchases of Mini Thins from Daas. These records showed that Daas sold 137 cases of Mini Thins to the Bilkoos between February 12, 1996 and February 10, 1997. Of those, all but six were sold in a five-month period. During that same period, Daas sold only 46 cases of Mini Thins to the other markets he supplied.

From some of the receipts, it appeared as though Daas had sold a smaller quantity of Mini Thins over a longer span of time than was actually the case. Together the invoices and the receipts showed that, just days after having supplied several cases of Mini Thins to the Bilkoos, Daas sometimes sold them several more.

Agent Wolters testified that one case of Mini Thins used daily to the maximum dosage would last an individual more than six years, and one case of Pseudo Thins would last just under six years. Both products had expiration dates of two years from their production.

During her summation to the jury, the assistant United States attorney made the following statements, now challenged on appeal:

By the time—by now, the Bilkoos have learned that the government is skilled. Agent Wolters is skilled at figuring out when they haven't told the complete truth. He was able to dig through and find out that they had sold lots more cases of Mini Thins than they told. So they know they better not do that again because it won't work.

Their plea agreement calls for them to be completely truthful. If they do that, they can get their sentences reduced. If they don't do that, then they don't get a sentence reduction, and they do more time. So their motive is to tell the truth, not to lie. If they were to lie under oath, they would face perjury prosecution as well.

In the end, they would end up getting more time than less. Also remember that these witnesses are not walking away. Mr. Singh has already done some time in custody, and Bill Bilkoo and Pari Bilkoo expect to do some time in custody as a result of their deal.

After deliberating for about four hours, the jury sent a note to the district court judge stating that it was deadlocked. The judge polled the jurors individually. All confirmed that they were deadlocked and that further deliberations would be futile, but one did so only after some hesitation. Based on the juror's hesitation, the district

3. Makhan Bilkoo corroborated the testimony by his son and Singh that Daas had told them that Mini Thins and Pseudo Thins were used to manufacture methamphetamine and that the Bilkoos and Singh should be careful when selling these products.

court judge gave the jury an *Allen*[4] charge after a sidebar conference with counsel. The jury deliberated approximately another hour and returned a guilty verdict.

Daas moved for a new trial. In his motion, Daas raised the three challenges to his conviction that are at issue in this appeal. The district court judge denied Daas's motion.

Daas then filed his objections to the presentence report and sentencing memorandum. Daas (1) objected to the government's two-point obstruction of justice enhancement based on perjury by Daas, (2) requested a downward departure based on the contention that the conviction represented a single instance of aberrant behavior, and (3) requested a downward departure based on the disparity between the Bilkoos' sentence, six months' home detention, and his own. The district court rejected Daas's objections to the presentence report, sentenced Daas to 97 months in prison, and imposed judgment.

On the same day Daas was sentenced, this court issued its opinion in *United States v. Garcia–Guizar*, 160 F.3d 511 (9th Cir.1998), which held in part that the same district court judge as in the present case abused his discretion by applying the obstruction of justice enhancement without making a factual finding to support the alleged falsehood. *Id.* at 524. Four days later, the district court judge issued factual findings to support the obstruction of justice enhancement in Daas's case.

## ANALYSIS

### A. Sufficiency of the Evidence

■ Daas contends that the evidence was insufficient to support his conviction because 21 U.S.C. § 841(d)(2) criminalizes the distribution of pure ephedrine or pseudoephedrine but not the distribution of a mixture, such as Mini Thins and Pseudo Thins, containing these chemicals. Daas does not contend that he was improperly convicted if the government's reading of § 841(d)(2) is correct. Thus his challenge to the sufficiency of the evidence is purely a question of statutory construction.

According to Daas, congressional intent to exclude mixtures from the scope of § 841(d)(2) is evidenced by other provisions of Title 21 consistent with his interpretation of § 841(d)(2), by the legislative history of the Controlled Substances Act, and by policy considerations. Specifically, Daas contends that (1) because the term "controlled substance" is defined to include both mixtures and pure substances,[5] and because "listed chemical" is not defined as comprehensively,[6] § 841(d)(2) covers listed chemicals in their pure form only; (2) Congress enacted other statutes which regulate the distribution of mixtures like Mini Thins and Pseudo Thins with both civil and criminal penalties;[7] (3) when enacting the Comprehensive Methamphetamine Control Act of 1996 ("CMCA"), several legislators made remarks distinguishing between the need for criminal penalties to punish conduct relating to methamphetamine and its precursor chemicals and regulation of legitimate products containing precursors; and (4) under the government's construc-

4. The charge derives from *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

5. Title 21 U.S.C. § 812 sets forth schedules of controlled substances encompassing both pure substances and mixtures.

6. Title 21 U.S.C. § 802(34), subsections (C) and (K), define "listed chemicals" to include ephedrine and pseudoephedrine without distinguishing between pure substances and mixtures.

7. The relevant statutes are 21 U.S.C. §§ 821 (authorizing regulation), 822 (requiring reporting), 830 (requiring record-keeping), 842(a)(11) (criminalizing distribution with reckless disregard as to probable illegal use), 843(a)(8) (criminalizing manufacture of mixture to evade record-keeping requirements), and 843(a)(9) (criminalizing distribution of a list I chemical without required registration).

tion of § 841(d)(2), importers, manufacturers, and wholesalers of products like Mini Thins and Pseudo Thins are all guilty.

These contentions lack merit.[8]

### 1. Standard of Review

■■■ This court reviews for plain error the sufficiency of the evidence, as Daas did not move for acquittal on this ground. *See United States v. Garcia–Guizar*, 160 F.3d 511, 516–17 (9th Cir.1998). In its discretion, this court will recognize plain error if necessary "to prevent a miscarriage of justice or to preserve the integrity and the reputation of the judicial process." *Id.* at 516. Evidence is insufficient to support a conviction if, when viewed in the light most favorable to the prosecution, "no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

### 2. Merits

■■■ The purpose of statutory construction is to discern the intent of Congress in enacting a particular statute. *See Adams v. Howerton*, 673 F.2d 1036, 1040 (9th Cir.1982). The first step in ascertaining congressional intent is to look to the plain language of the statute. *See United States v. Mohrbacher*, 182 F.3d 1041, 1048 (9th Cir.1999). To determine the plain meaning of a particular statutory provision, and thus congressional intent, the court looks to the entire statutory scheme. *See Yang v. California Dep't of Soc. Servs.*, 183 F.3d 953, 959 (9th Cir.1999) (examining other statutes within the same act to discern plain meaning); *United States v.*

*Hockings*, 129 F.3d 1069, 1071 (9th Cir. 1997) (same). If the statute uses a term which it does not define, the court gives that term its ordinary meaning. *See Mohrbacher*, 182 F.3d at 1048.

■■■ The plain meaning of the statute controls, and courts will look no further, unless its application leads to unreasonable or impracticable results. *See Seattle–First Nat. Bank v. Conaway*, 98 F.3d 1195, 1197 (9th Cir.1996); *Mester Manuf. Co. v. INS*, 879 F.2d 561, 567 (9th Cir.1989). If the statute is ambiguous—and only then—courts may look to its legislative history for evidence of congressional intent. *See Perlman v. Catapult Entertainment, Inc. (In re Catapult Entertainment, Inc.)*, 165 F.3d 747, 753–54 (9th Cir.1999).

Read for its plain meaning § 841(d)(2) encompasses mixtures such as Mini Thins and Pseudo Thins.[9]

#### a. The Plain Meaning of "Listed Chemical"

Daas was convicted under 21 U.S.C. § 841(d)(2) for distributing a "listed chemical," defined at 21 U.S.C. § 802(34) subsections (C) and (K) to include "[e]phedrine, its salts, optical isomers, and salts of optical isomers" and "pseudoephedrine, its salts, optical isomers, and salts of optical isomers." Daas believes that this definition does not include mixtures like Mini Thins and Pseudo Thins, each of which contains a "listed chemical" among other ingredients.

The Supreme Court has adopted a definition of mixture as "a portion of matter

---

8. Daas further contends that his trial counsel was ineffective for failing to present these arguments to the district court judge. Because the court concludes that § 841(d)(2) covers the conduct for which Daas was convicted, Daas's claim of ineffective assistance of counsel necessarily fails. *See Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (recognizing as ineffective only conduct "outside the wide range of professionally competent assistance"); *see also United States v. Quintero–Barraza*, 78 F.3d 1344, 1347 (9th Cir.1995)

(recognizing that when the record is sufficiently developed on direct appeal to review a defendant's claim that his trial counsel was ineffective, counsel's effectiveness is reviewed de novo).

9. The Controlled Substances Act encompasses all the statutes discussed in this section of the opinion. *See* United States Code Annotated, Popular Name Table for Acts of Congress (West 1999).

consisting of two or more components that do not bear a fixed proportion to one another and that however thoroughly commingled are regarded as retaining a separate existence." *Chapman v. United States*, 500 U.S. 453, 461, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (citation omitted). A chemical compound, on the other hand, "necessarily implies not a mere mingling of components but a chemical combination of them, resulting in their destruction as distinct entities and in the development of a new substance possessing properties radically different from those of its constituent elements." *Strohmeyer & Arpe Co. v. United States*, 2 Ct. Cust. 285, 287 (1911).

The ephedrine and pseudoephedrine in Mini Thins and Pseudo Thins "retain a separate existence" and are easily extractable. Indeed, Daas's own expert witness, a professor of pharmaceutical chemistry, acknowledged that Mini Thins and Pseudo Thins are mixtures containing extractable ephedrine and pseudoephedrine. (Declaration of Stephen B. Kahl, Ph.D., at ¶ 6–7, 13.) Therefore, the ephedrine and pseudoephedrine in Mini Thins and Pseudo Thins are plainly "listed chemicals" within the meaning of § 841(d)(2).

■■■ The chemical matrix in which ephedrine and pseudoephedrine are contained is irrelevant because they do not disappear, become different chemicals, or become useless when combined with other substances to make Mini Thins and Pseudo Thins. For purposes of § 841(d)(2), the other ingredients in Mini Thins and Pseudo Thins function solely as a carrier medium or packaging material facilitating distribution of the listed chemical. *Cf. Chapman*, 500 U.S. at 466, 111 S.Ct. 1919 (observing that LSD-infused blotter paper "makes LSD easier to transport, store, conceal, and sell" and "is a tool of the trade for" traffickers); *United States v.*

*Crowell*, 9 F.3d 1452, 1454 (9th Cir.1993) (describing dilaudid tablets—a mixture of inert ingredients and hydromorphone—as a carrier medium used to facilitate distribution); *United States v. Robins*, 967 F.2d 1387, 1389–90 (9th Cir.1992) (describing as "packaging material" cornmeal into which defendant had mixed cocaine). So long as the ephedrine and pseudoephedrine retain their integrity or "separate existence," their utility remains unaffected.[10]

Consequently, the plain meaning of "listed chemical" encompasses the ephedrine and pseudoephedrine contained in Mini Thins and Pseudo Thins.

**b. Comparison of Subsections (a) and (d)(2) of § 841**

According to Daas, a comparison of § 841(d)(2) to another subsection of the same statute, namely, subsection (a), signals an intentional exclusion of mixtures from the scope of (d)(2). Subsection (a) is analogous to subsection (d)(2) in that subsection (a) criminalizes the distribution of a "controlled substance," while (d)(2) criminalizes the distribution of a "listed chemical," *i.e.*, any chemical listed at 21 U.S.C. § 802(34) & (35). Subsection (a) refers only to a "controlled substance." Similarly, subsection (d)(2) refers only to a "listed chemical." The term "controlled substances," however, is defined to encompass specific substances both in pure form and in mixtures with other, non-prohibited ingredients. *See, e.g.*, 21 U.S.C. §§ 812, Schedule II(a) (listing controlled substances); 841(b) (listing penalties for violation of subsection (a)). In contrast, the provisions defining "listed chemical," 21 U.S.C. § 802(34), and (35), name ephedrine and pseudoephedrine, among other chemicals, without making reference to mixtures. Daas argues that because Congress

---

10. Where the evidence shows that a defendant acted with culpable intent, the fact that Mini Thins and Pseudo Thins also may be used lawfully is irrelevant to the applicability of § 841(d)(2). *Cf. United States v. Caperell*, 938 F.2d 975, 979 (9th Cir.1991) (stating that

"[i]t is ludicrous to believe that authorization for sale over the counter of a product containing a small amount of a controlled substance renders that controlled substance lawful ... in all forms.") (quoting *United States v. Housley*, 751 F.Supp. 1446, 1447 (D.Nev.1990)).

knew how to define substances to encompass mixtures as well as the substances in their pure forms but failed to so define "listed chemical," Congress did not intend that "listed chemical" in § 841(d)(2) encompass both pure listed chemicals and mixtures containing them.

Daas's argument fails. Other provisions of the Controlled Substances Act criminalize mixtures even where only pure substances are initially specified. Daas relies on the schedules at § 812 to assert that subsection (a)'s prohibition on "controlled substance" criminalizes some substances as mixtures while criminalizing others in pure form only. This interpretation of subsection (a) is belied by a careful comparison of substances listed at § 812 and the related penalties specified at § 841(b). For example subsection (a), read together with § 802(6) (defining "controlled substances") and § 812 (setting forth the five schedules of "controlled substances"), initially appears to criminalize conduct involving heroin in its pure form only. *See* 21 U.S.C. § 812, Schedule I(b)(10). This impression dissolves after a review of § 841(b)(1)(A)(i), which imposes a ten-year mandatory minimum sentence for conduct involving a mixture *containing* heroin. Thus subsection (a) criminalizes mixtures containing a "controlled substance" even when that "controlled substance" is defined by § 812 in its pure form only. It follows that a "listed chemical" criminalized at subsection (d) includes mixtures containing a "listed chemical" as well as such a chemical in its pure form.

### c. Statutory Scheme to Regulate Certain Transactions Involving a "Listed Chemical"

Daas argues that further evidence of congressional intent to exclude mixtures from the scope of § 841(d)(2) is the existence of a distinct regulatory scheme targeting transactions like those underlying Daas's conviction. That statutory scheme,

enacted in 1996 as part of the CMCA, requires reporting and record-keeping for "regulated transactions"—defined to include transactions involving lawful drugs containing listed chemicals such as ephedrine and pseudoephedrine. *See* 21 U.S.C. §§ 802(39)(iv)(I)(aa) & (bb),[11] 821–22, 830, 842, 843. Neither Daas nor the government disputes that Daas was subject to these reporting and record-keeping requirements. Rather, the parties differ as to whether Daas was subject to criminal penalties under § 841(d)(2) in addition to those authorized under the reporting and record-keeping requirements.

First, Daas argues, the provisions of § 802(39)(iv)(I)(aa) and (bb) describe transactions exactly like those at issue here—*i.e.*, transactions in lawful medication containing ephedrine and pseudoephedrine—and subjects them to the reporting and record-keeping requirements. This careful description is absent from § 841(d)(2) or any of its definitional provisions. Thus Congress was aware of the diversion of legal drugs to manufacture controlled substances. In Daas's view, the omission from § 841(d)(2) and its related provisions of reference to diverted lawful drugs suggests that Congress chose to address this problem by enacting the reporting and record-keeping requirements. The descriptions in § 802(39)(iv)(I)(aa) and (bb), he contends, further underline that Congress drew a distinction between pure "listed chemicals" and lawful medication like Mini Thins and Pseudo Thins. Daas's arguments do not withstand scrutiny.

The regulatory scheme is not inconsistent with congressional intent to subject distributors like Daas to criminal penalties in addition to reporting and record-keeping requirements. Daas has cited no authority for the proposition that serious penalties for distributing certain substances and lesser penalties for regulatory violations are, or should be, mutually exclusive. *Cf. United States v. Moore*, 423

---

11. These provisions subject over-the-counter products containing ephedrine and pseu-

doephedrine to regulatory requirements. *See* 21 U.S.C. § 802(39)(A)(iv)(aa) & (bb).

U.S. 122, 136–38, 96 S.Ct. 335, 46 L.Ed.2d 333 (1975) (holding that the existence of regulatory penalties governing physicians who distribute methadone do not exempt physicians subject to those penalties from criminal prosecution for distributing a controlled substance); *United States v. Urrutia*, 897 F.2d 430, 431 (9th Cir.1990) (per curiam) (holding that two separate statutes prohibiting bank fraud and bank robbery, respectively, are not mutually exclusive, pointing out that nothing in the statutory language suggests otherwise); *United States v. Wright*, 742 F.2d 1215, 1219 (9th Cir.1984) (holding that two separate statutes prohibiting marijuana possession and marijuana cultivation, respectively, are not mutually exclusive), *overruled on other grounds, United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984).

The regulatory provisions are not evidence of congressional intent to exempt distributors like Daas from criminal penalties under § 841(d)(2). Section 802(39)(iv)(I), subsections (aa) and (bb) were added to the Controlled Substances Act in 1996 as part of the CMCA. *See* 142 Cong. Rec. H11113 (September 25, 1996). Therefore, section 841(d)(2) pre-existed § 802(39)(iv)(I)(aa) and (bb) by eighteen years. Because the newer sections were enacted after the meaning of § 841(d)(2) was established, it follows that § 802(39)(iv)(I)(aa) and (bb) do not enable Daas to create an ambiguity in § 841(d)(2). If, by enacting the CMCA in 1996, Congress had intended to exempt distributors like Daas from liability under § 841(d)(2), it would have amended § 841(d)(2) to make this intention clear. Otherwise, the court must presume that the original meaning of § 841(d)(2) is still valid.

Moreover, contrary to what Daas contends, § 843(a), subsections (8)[12] and (9),[13] are not mutually exclusive with a reading of § 841(d)(2) that encompasses Mini Thins and Pseudo Thins. First, no statutory language evidences any congressional intent that § 841(d)(2) and the regulatory provisions be mutually exclusive. *Cf. Moore*, 423 U.S. at 136–38, 96 S.Ct. 335; *Urrutia*, 897 F.2d at 431; *Wright*, 742 F.2d at 1219. Indeed, § 841(d)(2) defines a categorically distinct—and more serious—type of offense from those defined in the regulatory provisions. Second, because § 843(a), subsections (8) and (9) penalize conduct involving a "listed chemical," Daas's contention that "listed chemical" excludes mixtures like Mini Thins and Pseudo Thins would make those subsections inapplicable to him. Thus the regulatory provisions do not evidence congressional intent to subject distributors like Daas to lesser penalties only.

### d. Results of Reading Over-the-Counter Drugs Out of the Scope of § 841(d)(2)

Daas's reading of § 841(d)(2) would create a conspicuous gap in the scheme of the Controlled Substances Act. According to Roger Ely, a forensic chemist with the Drug Enforcement Administration who testified for the government at Daas's trial, traffickers in precursor chemicals used to manufacture methamphetamine have in recent years dealt increasingly in over-the-counter medications containing precursors. Ely explained that the reason traffickers have turned away from pure ephedrine in favor of over-the-counter medications containing ephedrine is to circumvent the regulatory scrutiny attendant on transactions in pure ephedrine.

---

**12.** This subsection makes it illegal to knowingly or intentionally "create a chemical mixture for the purpose of evading a requirement of section 830 of this title or to receive a chemical mixture created for that purpose...." 21 U.S.C. § 843(a)(8). Title 21 U.S.C. § 830 sets forth various reporting and record-keeping requirements for transactions involving a "listed chemical."

**13.** This subsection makes it illegal to knowingly or intentionally "distribute, import, or export a list I chemical without the [required registration]." 21 U.S.C. § 843(a)(9).

Thus, under Daas's reading of § 841(d)(2), even if fully aware that their products were used to manufacture methamphetamine, high-volume distributors of over-the-counter products containing precursor chemicals would escape serious criminal liability if not participating in a conspiracy. The size of the gap strongly suggests Daas's construction was not what Congress intended. *See Mester,* 879 F.2d at 567 (recognizing that the court interprets a statute to avoid unreasonable results).

## B. Prosecutorial Vouching

■■■ Daas contends that the prosecutor twice improperly vouched for the credibility of its two witnesses who supplied the only direct evidence of Daas's culpable intent. He further contends his trial counsel was ineffective for failing to object to the prosecutor's allegedly improper remarks. According to Daas, the remarks constituting vouching were the prosecutor's statements in closing argument that the Bilkoos: (1) would be prosecuted for perjury if they were not telling the truth, and (2) knew that Agent Wolters was skilled at ascertaining whether or not they were telling the truth. During the hearing on Daas's new trial motion the district court found—and the prosecutor conceded—that the first remark constituted vouching.[14]

The prosecutor's remarks do not require reversal. Nor was Daas's counsel ineffective for failing to object to the remarks.

### 1. Standard of Review

■■■ Claims that a prosecutor improperly vouched for the credibility of witnesses are reviewed for plain error when, as here, no objection was made by the defendant. *See United States v. Rudberg,* 122 F.3d 1199, 1206 (9th Cir.1997). "Plain error is highly prejudicial error affecting substantial rights." *Id.*

### 2. Merits

■■■ A prosecutor vouches for the credibility of a witness when she implies that the government can guarantee the witness's veracity in either of two ways: by (1) "placing the prestige of the government behind a witness through personal assurances of the witness's veracity," or (2) "suggesting that information not presented to the jury supports the witness's testimony." *United States v. Necoechea,* 986 F.2d 1273, 1276 (9th Cir.1993). No bright-line rule dictates when vouching requires reversal. *See id.* at 1278. Relevant factors include

> the form of vouching; how much the vouching implies that the prosecutor has extra-record knowledge of or the capacity to monitor the witness's truthfulness; any inference that the court is monitoring the witness's veracity; the degree of personal opinion asserted; the timing of the vouching; the extent to which the witness's credibility was attacked; the specificity and timing of a curative instruction; the importance of the witness's testimony and the vouching to the case overall.

*Id.* To ascertain whether the alleged vouching amounts to plain error, the court balances the seriousness of the vouching against the effectiveness of any curative instruction and the closeness of the case. *See id.*

■■■ No vouching requiring reversal took place here. The prosecutor made no personal assurances of veracity, either explicitly or implicitly. Moreover, with one exception, the prosecutor's comments made no reference to matters outside the record. Indeed, it was defense counsel who, on cross-examination, elicited from the Bilkoos and Singh testimony about their plea agreements and the benefits they expected to receive from the government. The first of the prosecutor's two challenged statements was a fair comment on other testimony by the Bilkoos to the

---

14. A concession by the government as to a legal conclusion is not binding on this court.

*See United States v. Miller,* 822 F.2d 828, 832 (9th Cir.1987).

effect that they were not completely truthful with Agent Wolters upon their arrest, but that they eventually started telling him the truth.

The statements by the prosecutor simply focused the jury's attention on the incentives the Bilkoos had to tell the truth. Both challenged statements went to the Bilkoos' state of mind before testifying: they knew that (1) Agent Wolters had previously learned that they had lied, and (2) they could be prosecuted for perjury if they lied. The second statement, while more problematic than the first, immediately followed the prosecutor's explanation that because the Bilkoos' knew that their sentence reductions depended upon their truthful testimony, their motive was to tell the truth.

The jury was made aware it was free to reject the Bilkoos' testimony. Both statements followed the defendant's challenges, during opening statement and cross-examination, to the witnesses' credibility. The jury was instructed that arguments of counsel are not evidence, that it was the jury's role to assess the credibility of witnesses, and that the testimony of the Bilkoos and Singh was to be considered with greater caution in light of the possibility they would receive benefits from the government. It was left to the jury to decide whether, faced with the competing incentives and disincentives to telling the truth, the witnesses actually told the truth.

Thus the prosecutor's reference to the possibility of the Bilkoos' prosecution for perjury was at worst mild vouching. Balanced against this mild vouching is sufficient other, "non-vouched" evidence of Daas's intent—most tellingly, the large volume of his sales and his apparent doctoring of invoices to make it appear on several instances that a single sale of a large quantity was actually multiple sales of smaller quantities. It is immaterial that this evidence was circumstantial. See Necoechea, 986 F.2d at 1281. The prosecutor's remarks do not amount to reversible

error under the plain error standard of review.

Moreover, Daas's claim that he was denied effective assistance of counsel because his trial counsel failed to object to the prosecutor's remarks during closing argument has no merit. His counsel's decision not to so object falls within the range of permissible professional conduct of trial counsel. See Necoechea, 986 F.2d at 1281. Finally, because Daas's trial counsel may have had sound strategic reasons for not objecting to those remarks, the district court judge had no independent obligation to "take notice sua sponte of the problem" and "inquire further" into the effectiveness of Daas's counsel. United States v. Wagner, 834 F.2d 1474, 1483 (9th Cir.1987) (recognizing that a district court judge is under no obligation to question defense counsel's trial strategy).

## C. *Allen* Charge

Daas contends that the district court improperly coerced the jury's guilty verdict by giving it a modified *Allen* charge after receiving a note that the jury was deadlocked. Specifically, according to Daas, the *Allen* charge may have coerced the jury because of the brief period of deliberations both before and after the charge and the potential pressure the charge may have placed on "holdout" jurors to change their opinions. These contentions are without merit.

### 1. Standard of Review

This court reviews for abuse of discretion a district court's decision to issue a modified *Allen* charge. See *United States v. Plunk*, 153 F.3d 1011, 1027 (9th Cir.1998). This court must uphold the district court's decision unless the record makes it clear that the *Allen* charge had a coercive effect on the jury. See *id*.

### 2. Merits

In assessing the coerciveness of an *Allen* charge, this court evaluates three

things: (1) the form of the instruction, (2) the time the jury deliberated after receiving the charge as compared to the total time of deliberation, and (3) any other indicia of coerciveness. *See id.*

■ None of these factors weighs in favor of finding coercion here. The district court gave a neutral form instruction based on the Ninth Circuit Model Criminal Jury Instruction No. 7.6. *See* Ninth Circuit Manual of Model Criminal Jury Instructions, No. 7.6 (1997); *see also United States v. Hernandez,* 105 F.3d 1330, 1334 (9th Cir.1997) (describing Model Instruction No. 7.6 as a proper *Allen* instruction). The district court judge gave the *Allen* charge when, after he polled the jurors as to the usefulness of further deliberations, defense counsel pointed out to him that one of the jurors hesitated before answering "no." There is no reason to believe the form of the instruction would have been perceived as coercive by jurors holding the minority view, particularly since the district court judge did not inquire as to the numerical division and thus did not know whether the majority was in favor of conviction or acquittal. *See Hernandez,* 105 F.3d at 1333–34 (holding that "the usual indicia of coercion" in giving an *Allen* instruction are not present where the " 'judge ... did not know the numerical division of the jury, or even which way the jury was leaning, let alone which way each particular juror was inclined to vote.' ") (quoting *United States v. Easter,* 66 F.3d 1018, 1023 (9th Cir.1995)). The total time the jury deliberated was between four-and-a-half and five hours, one hour of which followed the *Allen* charge. Because a significant portion of the deliberations took place after the *Allen* charge, the timing fails to suggest coercion. *Cf. id.* at 1334 (holding that jury deliberations of only 40 minutes following an *Allen* charge are not " 'so disproportionate to the task before the jury as to suggest that the *Allen* charge coerced the jury into returning its verdict.' ") (quoting *United States v. Cuozzo,* 962 F.2d 945, 952 (9th Cir.1992)). A review of the record makes it far from clear that the *Allen* charge had a coercive effect on the jury, *see Plunk,* 153 F.3d at 1027, and Daas's challenge to the *Allen* charge therefore fails.

## D. Downward Departure for Sentencing Disparity

Daas contends that the district court erred by refusing to entertain his request for a downward departure based on the disparity in his sentence and the sentences received by the Bilkoos and Singh. The district court's ruling on this request was as follows:

> You make two arguments on downward departure. One argument is based upon your contention that there's a disparity in sentencing of the defendants. Your request for a downward departure on that ground is denied. *See [United States v.] Enriquez–Munoz,* 906 F.2d at 1359, 1360 (9th Cir.1990). The issue's submitted.

This contention has merit.

### 1. Standard of Review

■ The district court's interpretation and application of the Sentencing Guidelines is reviewed de novo. *See United States v. Merino,* 190 F.3d 956, 958 (9th Cir.1999).

### 2. Merits

■ In the case relied upon by the district court, *Enriquez–Munoz,* this court held that an upward departure to equalize disparate sentences was impermissible under the Sentencing Guidelines. *Id.* at 1360. Six years later, the United States Supreme Court in *Koon v. United States,* 518 U.S. 81, 109, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) held that, unless the guidelines specifically prohibit downward departure on a particular ground, the sentencing court must determine whether the facts of the case warrant departure on that ground. Downward departure to equalize sentencing disparity is a proper ground for

departure under the appropriate circumstances. *See* 28 U.S.C. § 991(b)(1)(B); U.S.S.G. Ch. 1, Pt. A, p.s. 3. ("Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders."). Indeed, a central goal of the Sentencing Guidelines is to eliminate sentencing disparity. *See Koon*, 518 U.S. at 113, 116 S.Ct. 2035 ("The goal of the Sentencing Guidelines is, of course, to reduce unjustified disparities and so reach towards the evenhandedness and neutrality that are the distinguishing marks of any principled system of justice.").

Here, the record indicates that the district court believed incorrectly that it lacked the authority to depart downward based on sentencing disparity. Because the district court actually had this authority but mistakenly failed to exercise it to determine whether the facts here warranted departure, this court remands for findings as to whether a downward departure is appropriate.

## E. Factual Findings re Obstruction of Justice

The district court imposed a two-level increase in Daas's base offense level based on its finding that Daas perjured himself during his testimony at trial. Four days after the sentencing hearing and the imposition of judgment, the district court issued written findings to support the obstruction of justice enhancement.

According to Daas, the district court erred in multiple respects when it imposed the obstruction of justice enhancement under U.S.S.G. § 3C1.1. First, the district court allegedly refused to allow counsel to argue in opposition to imposition of the enhancement. Second, the district court erred by failing to make specific findings until five days later when, outside the presence of the defendant and counsel, it

issued written findings to support imposing the enhancement.[15]

These contentions fail.

### 1. Standard of Review

A district court's interpretation of the Sentencing Guidelines is reviewed de novo. *See United States v. Merino*, 190 F.3d 956, 958 (9th Cir.1999). Factual findings in support of a sentencing enhancement are reviewed for clear error. *See United States v. Garcia–Guizar*, 160 F.3d 511, 524 (9th Cir.1998). Application of the guidelines to the facts of a particular case is reviewed for abuse of discretion. *See id.*

### 2. Merits

An adjustment must be imposed under U.S.S.G. § 3C1.1 if the district judge determines that the defendant, with willful intent, gave false testimony concerning a material matter. *See United States v. Monzon–Valenzuela*, 186 F.3d 1181, 1183 (9th Cir.1999). If the defendant objects, the district court must review the evidence and make findings to support the enhancement. *See id.*

The district court did not err in imposing the obstruction of justice enhancement. Daas submitted written argument concerning the propriety of imposing the enhancement.[16] Moreover, at the sentencing hearing he argued that the enhancement was unwarranted. The fact that the district court judge eventually cut off his argument on this point does not violate due process. The district court made the required findings in written form, and Daas has failed to explain to this court why those findings were in error. *See* Fed.R.Crim.P. 32(c)(3)(D) (requiring generally that court make findings on all controverted matters, with no specific requirement that those findings be made at the sentencing hearing). Moreover, the defendant's right to allocution permits him

---

**15.** Daas does not argue the merits of the enhancement.

**16.** The government submitted written materials on this point as well.

to speak so that he may influence whether the district court chooses the lower, middle or higher end of the guideline range, not so that he can argue the legal merits of a particular guideline. *See United States v. Medrano,* 5 F.3d 1214, 1219 (9th Cir.1993).

Consequently, the district court properly imposed an enhancement for obstruction of justice.

## F. Downward Departure for Aberrant Behavior

Daas contends that the district court improperly failed to exercise its discretion to depart downward on the ground that Daas's conduct reflected aberrant behavior. This contention lacks merit.

### 1. Standard of Review

 This court may not review a district court's discretionary decision not to depart downward from the Sentencing Guidelines. *See United States v. Ladum,* 141 F.3d 1328, 1343–44 (9th Cir.) (district court need not explicitly comment on its authority to depart), *cert. denied,* —— U.S. ——, 119 S.Ct. 225, 142 L.Ed.2d 185 (1998).

### 2. Merits

 A district court may depart downward for a defendant's aberrant behavior if it finds the facts warrant such a departure. *See United States v. Colace,* 126 F.3d 1229, 1231 (9th Cir.1997).

 Here, the district court assessed the relevant facts and compared them to the facts in *Colace,* ultimately concluding that, as in *Colace,* no departure was warranted. Thus the court recognized it had the discretion to grant a departure.

Although it made some comments suggesting it believed it lacked authority to depart downward, the district court ultimately recognized and exercised its discretion not to depart. On several occasions, the district court judge expressed his view that Daas's conduct did not warrant a departure. Although the district court judge remarked at one point that he lacked the authority to depart downward,[17] he later implicitly recognized that he did have this authority and that the facts did not justify its exercise.[18]

## CONCLUSION

The court remands for further proceedings on Daas's request for a downward departure based on sentencing disparity and affirms on the remaining grounds.

**17.** The judge stated, "[W]hen a judge says that he doesn't have authority, or he or she doesn't have authority to depart, that that may be a basis to appeal the judge's ruling. And I will probably say that in this case. So you will have that as an appellate issue, because I do not believe that under the facts of this case I do have the authority to depart in the aberrant behavior doctrine."

**18.** After the Assistant United States Attorney twice explained that the judge had the authority to depart downward if the facts so warranted, the judge stated, "The facts as they've been argued here are insufficient for downward departure under Ninth Circuit law."