GOULD, Circuit Judge,
with whom KOZINSKI, Chief Judge, joins, dissenting:
I would reverse and remand with instructions for the district court to dismiss, on the theory that the Foreign Sovereign Immunities Act (“FSIA”), under 28 U.S.C. § 1605(a)(3), has not waived the sovereign immunity of Spain or its instrumentality the Foundation. Hence I respectfully dissent. I have misgivings because the genocidal regime of Nazi Germany renders Cassirer, as an heir with purported rights to a Pissaro painting stolen by the Nazis, a most sympathetic claimant. And I dissent with trepidation because the vast majority of judges on this panel of eleven would not reverse outright on the view that the sovereign immunity of Spain and its Foundation has not been waived by § 1605(a)(3) of the FSIA.[1] But two wrongs do not make a right, and, notwithstanding the Nazis’ campaign of genocide against Jews and theft of their property, if Spain was not complicit in the Nazis’ taking of the Pissaro,[2] I do not believe that our Congress would have intended its loss of sovereign immunity under, the pertinent provision of the FSIA. Viewing § 1605(a)(3) as ambiguous, I conclude, all things considered, that it does not effectuate a waiver of sovereign immunity in this case as against Spain or the Foundation.
We start with the precise language of § 1605(a)(3):
“A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case ... in which rights in property taken in violation of international law are in issue.... ”
28 U.S.C. § 1605(a)(3).
Where “the intent of Congress is clear and unambiguously expressed by the statutory language,” no doubt the analysis ought to end there. Zuni Pub. Sch. Dist. No. 89 v. Dep’t of Educ., 550 U.S. 81, 93, 127 S.Ct. 1534, 167 L.Ed.2d 449 (2007). The statute does not expressly say that the property must be taken “by the foreign state” (as Spain and the Foundation contend). But neither does the statute expressly say the property must be taken “by any foreign state” (as Cassirer contends). This lack of clarity is sufficient to conclude that the statute is ambiguous and subject to review of the legislative history for evidence of congressional intent. See United States v. Daas, 198 F.3d 1167, 1174(9th Cir.1999); see also Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne De Navigation (C.N.A.N.), 730 F.2d 195, 205 (5th Cir. *1039 1984) (Higginbotham, J., concurring in part and dissenting in part) (“The FSIA presents a peculiarly twisted exercise in statutory draftsmanship.... Congress chose to make the exceptions in sections 1605-07 purposefully ambiguous, having decided to put their faith in the U.S. Courts, and thus attempted to provide only very modest guidance to the judiciary.” (internal punctuation omitted)). In my view, the district court, our prior panel, and now our en banc panel are mistaken in their judgment thinking this statutory term unambiguous.
Prior to our en banc panel’s decision today, it does not appear that any federal appellate court, apart from our prior panel whose opinion was taken en banc and is not precedent, has explicitly ruled on this issue. A few district-court decisions had previously agreed in approach with our prior panel’s conclusion that the plain language does not require that the foreign-state defendant be the party that allegedly expropriated the property. These decisions, stressing the passive voice in § 1605(a)(3), as well as the prior panel opinion adopting this same line, are not persuasive to me. Altmann v. Republic of Austria, 142 F.Supp.2d 1187, 1202(C.D.Cal.2001), was conclusory. Anderman v. Federal Republic of Austria, 256 F.Supp.2d 1098, 1109-10 (C.D.Cal. 2003), from the same district court, just cited it. Our prior panel’s opinion was also summary in nature.
The en banc majority similarly concludes that the plain language of the statute decides this issue. Maj. op. at 1027-28. According to the majority, because the text of the statute is written in the passive voice, Congress would have to rewrite the statute to include the language “by the foreign state” in order to give it the meaning that Spain ascribes to it. Id. at 1028. Having decided that plain meaning dictates its result, the en banc majority then examines the legislative history but only to determine if it “clearly indicates that Congress meant something other than what it said.” Id. at 1029 (quoting Carson Harbor Vill., Ltd. v. Unocal Corp., 270 F.3d 863, 877 (9th Cir.2001) (en banc)). That legislative history, according to the en banc majority, does not overcome the hurdle of plain meaning, because it in part emphasizes that a sovereign state’s commercial activities lie outside its otherwise sovereign immunity. Id. at 1030-31. Because I do not think the meaning of the text is so plain, as Congress would similarly have to rewrite the statute to include the language “by any foreign state” in order to give it the meaning that Cassirer ascribes to it, and because I view the legislative history as dictating another result, the “plain meaning” does not in my view set such a high hurdle for the legislative history to overcome.
Several voices that should command our attention, and more respect than is given by the majority, have stated the view that the waiver provision of § 1605(a)(3) applies to the state that has wrongfully expropriated property in violation of international law. The Fifth Circuit, for example, has said that “the legislative history of the FSIA indicates that section 1605(a)(3) was intended to subject to United States jurisdiction any foreign agency or instrumentality that has nationalized or expropriated property without compensation, or that is using expropriated property taken by another branch of the state.” Vencedora Oceanica, 730 F.2d at 204. The D.C. Circuit has also recently said that § 1605(a)(3) “effectively requir[es] that the plaintiff assert a certain type of claim: that the defendant (or its predecessor) has taken the plaintiffs rights in property (or those of its predecessor in title) in violation of international law.” Agudas Chasidei Chabad of U.S. v. Russian Fed’n, 528 F.3d 934, 941 (D.C.Cir.2008). Although these state- *1040 merits might be viewed as in the nature of dicta because the issue that we face was not squarely confronted, I do not view these statements as misleading dicta; rather, they point us in the correct direction. This is the view presented in the American Law Institute’s language in the Restatement, which also supports the interpretation that the defendant must be the foreign state that allegedly expropriated the property. Here is the Restatement of the ALI:
[T]he FSIA provides that if the property was taken by the foreign state in violation of international law, and if the property is ... owned or operated by an instrumentality of the foreign state that is engaged in commercial activity in the United States, there is a sufficient basis for jurisdiction to adjudicate claims to the property.
Restatement (Third) of Foreign Relations Law of the United States § 455 cmt. c (1987) (emphasis added).
I do not need to reach the proposed rationales that would turn decision on exhaustion.[3] Instead, we must first focus on whether Spain and the Foundation have taken property in violation of international law. Given that the statute is ambiguous, I would apply the usual tools of statutory construction and conclude that § 1605(a)(3) means that the property at issue must be taken in violation of international law by the foreign state defendant whose sovereign immunity shall be lost.
Considering the legislative history, the following points support my interpretation and that of the Fifth Circuit and D.C. Cireuit in their dicta and the Restatement position: The FSIA incorporates the concepts of the “Hiekenlooper Amendment,” which provided in pertinent part that disputes over expropriated property were justiciable when rights in property were asserted on the basis of a taking “by an act of that state in violation of the principles of international law.” See 28 U.S.C. § 2370(e)(2) (1982) (emphasis added); de Sanchez v. Banco Central De Nicaragua, 770 F.2d 1385, 1395(5th Cir.1985) (“Section 1605(a)(3) of the FSIA ... parallels the so-called ‘Hiekenlooper Exception’ to the act of state doctrine .... Like the Hiekenlooper Exception, Section 1605(a)(3) was intended to subject to United States jurisdiction any foreign agency or instrumentality that has nationalized or expropriated property without compensation, or that is using expropriated property taken by another branch of the state.” (quotation marks omitted and emphasis added)).
“Congress intended the FSIA to be consistent with international law....” Trajano v. Marcos (In re Estate of Ferdinand E. Marcos Human Rights Litigation), 978 F.2d 493, 497-98 (9th Cir.1992). The central premise of the FSIA is that “decisions on claims by foreign states to sovereign immunity are best made by the judiciary on the basis of a statutory regime which incorporates standards recognized under international law.” H.R.Rep. No. 94-1487, at 14 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6613. Section 1605(a)(3) “is based upon the general presumption that states abide by international *1041 law and, hence, violations of international law are not ‘sovereign’ acts.” West v. Multibanco Comermex, S.A., 807 F.2d 820, 826 (9th Cir.1987). When customary international law concludes that an act by a foreign state, that is, the taking of property in violation of international law, is no longer a sovereign act, the foreign state is no longer entitled to sovereign immunity. International law therefore supports the exercise of jurisdiction over foreign states that have themselves taken property in violation of international law; it does not support the exercise of jurisdiction over sovereign entities that have legitimately acquired property that was at some other time and by some other foreign state taken in violation of international law. To conclude otherwise would provide U.S. courts with unbridled jurisdiction over any sovereign foreign state that has in its possession property that was at one time taken in violation of international law by another foreign state. It would not matter if the expropriation occurred seventy years ago, as in this case, or seven hundred years ago. Congress would not have intended such a result.
The productive inquiry here is to ask what Congress intended by § 1605(a)(3), or, some might say, what Congress would have intended if the case presented had been expressly considered.[4] Because I do not believe that Congress would have intended Spain to suffer loss of its sovereign immunity by this provision if it had no complicity in the unlawful taking, I do not join the position of the majority.[5]
Also, the majority takes no heed of the fact that there may be important diplomatic implications of its decision. Rather than asking the United States Department of Justice and United States Department of State to weigh in on the question whether the majority’s statutory interpretation has diplomatic implications for the United States, the majority rushes head-long to give a procedural remedy to Cassirer. As I’ve said at the outset, Cassirer is a sympathetic claimant, being a victim of Nazi theft, yet that in itself is not sufficient to warrant a United States — led World Court approach, as the majority’s position permits. U.S. foreign policy has rebuffed such a position, as the United States withdrew, with limited exceptions, from the International Court of Justice in 1986 and *1042 has not joined the International Criminal Court, which was founded in 2002. Sean D. Murphy, Principles of International Law 135 (2006); Jennifer Elsea, Congressional Research Service, Report for Congress, U.S. Policy Regarding the International Criminal Court 2 (Aug. 29, 2006).
The majority’s view is not prudent unless sanctioned by the Department of State, and may be not prudent even if it had the State Department’s approval.[6] There is no showing of any manifest need in justice to give Cassirer a forum in the United States for a free shot against Spain, for absent any prior attempt at exhaustion of remedies in Spanish courts, there is no showing that he would meet with a sovereign immunity barrier there.
Further, other maxims of statutory interpretation are persuasive contrary to the majority’s interpretation. First, because there is ambiguity in interpretation, we should not adopt an interpretation that would violate the Constitution. United States v. Buckland, 289 F.3d 558, 564 (9th Cir.2002) (en banc) (“[E]very reasonable construction must be resorted to, in order to save a statute from unconstitutionality.... [I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is ‘fairly possible,’ we are obligated to construe the statute to avoid such problems.” (citations omitted)). Here, Cassirer’s due is to get the painting stolen by the Nazis or compensation for it. But Spain’s due is to have its sovereignty and sovereign immunity respected because, as I first noted, two wrongs don’t make a right. We should conclude that to strip Spain of its immunity because of a Nazi wrongdoing is a due process violation, because Spain is losing the sovereignty due to it with no showing or even allegation of complicity in wrong. In suggesting that there is a due process problem in the court’s interpretation, I am seeing a procedural problem. As a matter of procedural due process, it is hard to see how we could suggest rationally that Spain should have to answer questions about whether Nazi Germany’s taking of the painting, so many decades ago, offended international law. I am at a loss to understand how Spain could be expected to have any first-hand knowledge of what Nazi Germany did and why. Spain of course is aware of the general course of Nazi persecution of Jews, from the Nuremberg War Trials, but how can we say that Spain has any first-hand knowledge of Nazi Germany’s taking of the Pissaro painting at issue here? If the majority interprets its jurisdictional grant under § 1605(a)(3) to be invoked when there is unconstitutional action of any person taking a property, no matter what country, no matter when, this puts an unreasonable procedural burden on a nation like Spain without knowledge of the events creating jurisdiction, and I think that is a procedural due process problem.
Second, it has long been understood that statutes should not be construed to violate the law of nations if any other interpretation is possible. See Murray v. The Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804). As stated by Chief Justice Marshall in that case:
*1043 [A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains, and consequently can never be construed to violate neutral rights, or to affect neutral commerce, further than is warranted by the law of nations as understood in this country.
Id. at 118. It is my position that saying a taking by Nazi Germany in violation of international law waives the sovereign immunity of some innocent nation that comes upon the property later through legitimate means is a position that would not be accepted under international law.[7] See Restatement (Second) of Foreign Relations Law of the United States § 164 (1965) (“A state is responsible under international law for injury to an alien caused by conduct subject to its jurisdiction, that is attributable to the state and wrongful under international law.”) (emphasis added); id. § 183(explaining that a state is responsible under international law for injury to the property of an alien caused by conduct that is itself not attributable to the state if the injury resulted from the state not taking reasonable measures to prevent the conduct causing the injury or not reasonably attempting to impose a penalty on the person responsible for the conduct); Restatement (Third) of Foreign Relations Law of the United States § 207(“A state is responsible for any violation of its obligations under international law .... ” (emphasis added)); id. § 712(“A state is responsible under international law for injury resulting from ... a taking by the state of the property of a national of another state .... ” (emphasis added)). As we stated recently in Serra v. Lappin, the principle from The Schooner Charming Betsy is only a tool to aid our search for congressional intent, because Congress, if it wanted to do so, could legislate beyond the limits of international law. 600 F.3d 1191, 1198 (9th Cir.2010). As we explained in Cabrera-Alvarez v. Gonzales, “Congress has the power to legislate beyond the limits posed by international law.” 423 F.3d 1006, 1009(9th Cir.2005) (quotation marks omitted). The question is, in enacting § 1605(a)(3), did Congress mean to so infringe international law in its very provision finding violation of international law a basis for waiver of sovereign immunity?
There is still another principle of statutory construction that is applicable here. Specifically, we have sometimes recognized that statutes in derogation of the common law are to be strictly construed. United States v. Texas, 507 U.S. 529, 534, 113 *1044 S.Ct. 1631, 123 L.Ed.2d 245 (1993) (“[Statutes which invade the common law ... are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident”); Grace Line, Inc. v. Todd Shipyards Corp., 500 F.2d 361, 371 (9th Cir.1974) (“Any such rule of law, being in derogation of the common law, must be strictly construed, for no statute is to be construed as altering the common law, farther than its words import.” (quotation marks omitted)). We can say that the common law gives sovereign nations like Spain a sovereign immunity. The United States Supreme Court recently recognized this in Samantar v. Yousuf, where it stated, “The doctrine of foreign sovereign immunity developed as a matte of common law long before the FSIA was enacted in 1976.” 560 U.S. -, 130 S.Ct. 2278, 2285, 176 L.Ed.2d 1047 (2010) (citing Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983)). When the FSIA establishes a comprehensive system for finding exceptions to sovereign immunity in its specified categories, thus outlining when sovereign immunity should be considered to have been waived permitting suit against foreign nations in the United States, these statutory exceptions to sovereign immunity, being in derogation of common law, must be strictly construed, not expansively construed. If we give a strict construction to § 1605(a)(3), I think we logically would say that it is intended to cover violations of international law by the nation whose sovereignty is waived. But the majority, saying it covers violations of international law by anyone, is giving this provision, in derogation of the common law concept of sovereign immunity, an expansively unreasonable construction.
History and reason and comity all are allied in supporting that in this case Spain’s sovereignty should be respected.
History tells us that nations have a sovereign immunity that has been broadly respected by other countries in their legal systems and in the system of international law. See Stacy Humes-Schulz, Limiting Sovereign Immunity in the Age of Human Rights, 21 Harv. Hum. Rts. J. 105, 109-10 (2008) (“State sovereignty and sovereign immunity fall into the category of customary international law.... [S]tates will generally accord other states immunity out of the belief that this is an unwritten but obligatory international rule.”); Charles S. Rhyne, International Law 80 (1971) (“Corollary to a state’s right of independence and equality is its immunity from suit in foreign courts by foreign nationals.... In most states, this immunity from suit remains an absolute privilege.”); see also Verlinden, 461 U.S. at 486-88, 103 S.Ct. 1962(“For more than a century and a half, the United States generally granted foreign sovereigns complete immunity from suit in the courts of this country. [Even under the FSIA, a] foreign state is normally immune from the jurisdiction of federal and state courts ... subject to a set of exceptions.... ”).
Reason tells us that § 1605(a)(3) should here be interpreted in a way that respects Spain’s sovereign immunity. First and foremost, reason tells us that two wrongs don’t make a right, so a Nazi taking in violation of international law cannot reasonably be viewed as invoking waiver of sovereign immunity by a Spain that was not complicit in the taking. The language of the statute is ambiguous on its face, it does not say a taking by the foreign state, it does not say a taking by any one. Several important principles of statutory construction, that we shouldn’t interpret this statute in a way violating our Constitution’s Due Process Clause, that we shouldn’t interpret this statute in a way violating international law, and that we should give strict construction to waivers *1045 of sovereign immunity because they are in derogation of common law, all support a more modest interpretation of § 1605(a)(3) than that advanced by the majority.
The principle of comity tells us the same thing. “Comity is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation.” Dependable Highway Express, Inc. v. Navigators Ins. Co., 498 F.3d 1059, 1067 (9th Cir.2007) (quotation marks omitted). Thus it seems to me that because Spain is a sovereign with immunity from suit, we should respect that unless we have better reason than merely a deserving victim of Nazi aggression. Equally important, and I think a part of comity, is the common sense notion of the golden rule. We should not do to other nations what we would not want other nations to do to us. I am concerned that by indulging now the sympathetic claim of Cassirer as a Jewish heir with entitlement to priceless art stolen by Nazi Germany, but doing so at the cost of fairness to Spain and disrespect of its sovereignty, we will likely sow the seeds of maltreatment of the United States and its officials in foreign courts.
Hence, I respectfully dissent.

. One might ask, when there is such a firm supermajority for a position, what is the value of a dissent? The answer is that I pen this dissent to explain my views, because a dissent is a matter of individual judicial statement and individual judicial conscience. The majority's opinion is reasonable, even persuasive, but only within the limits it sets by invoking the plain-meaning rule. If the language was as plain to me as the majority perceives it to be, I would adopt a similar view and shrug off a concern that Congress has blundered. However, I view the language as ambiguous and I view traditional modes of statutory interpretation as pointing in a different direction, for the reasons that follow. These views may be considered by the bench of another court, by the interested bar, or by other interested persons.

. Although Franco was somewhat ambivalent in conduct relating to Fascist Germany and Fascist Italy, perhaps because of their help in Spain’s Civil War, Franco's regime in Spain never supported Nazi persecution of Jews and, instead, Spain was a safe haven for Jews fleeing Nazi Germany or occupied France. Indeed it has been estimated that Franco's policies during World War II saved the lives of tens of thousands of European Jews. Chaim U. Lipschitz, Franco, Spain, the Jews, and the Holocaust 4 (1984).

. If, contrary to my position, it were definitively decided that subject matter jurisdiction exists under the FSIA in so far as § 1605(a)(3) permits proceeding against any sovereign despite that the property was taken in violation of international law by a different sovereign, then I would conclude that exhaustion would be required by the statute, under § 1605(a)(3), as part and parcel of determining whether there had a been a taking in violation of international law. In this sense a requirement of exhaustion is embedded within the statute's exception for takings in violation of international law. However, believing that a waiver of sovereign immunity arises only as against a sovereign that took property in violation of international law, I do not have to reach this position.

. Benjamin Cardozo in The Nature of the Judicial Process states:
The ascertainment of intention may be the least of a judge's troubles in ascribing meaning to a statute. "The fact is,” says Gray in his lectures on the "Nature and Sources of the Law,” "that the difficulties of so-called interpretation arise when the legislature has had no meaning at all; when the question which is raised on the statute never occurred to it; when what the judges have to do is, not to determine what the legislature did mean on a point which was present to its mind, but to guess what it would have intended on a point not present to its mind, if the point had been present.”
Benjamin N. Cardozo, The Nature of the Judicial Process 15(Bibliolife 2009) (1921) (internal footnote omitted). A similar idea is expressed by Sir William Blackstone in his esteemed Commentaries on the Laws of England, where, in discussing "equity,” he states:
“For, since in laws all cases cannot be foreseen or expressed, it is necessary that, when the general decrees of the law come to be applied to particular cases, there should be somewhere a power vested of defining those circumstances, which (had they been foreseen) the legislator himself would have expressed.”
William Blackstone, 1 Commentaries on the Laws of England 61 (1765).

. Congress, of course, could amend its language in § 1605(a)(3) to be explicit about whether it means to waive sovereign immunity of an innocent nation like Spain when it is in possession of a property taken by some other person or nation in violation of international law.

. The record does not show any statement of position on proper scope of § 1605(a)(3) to our court from the United States Department of Justice or the United States Department of State. I am not able to discern if the State Department is merely slumbering through this matter, or if, for its own purposes, it is studiously avoiding comment and maintaining a conscious silence at this stage of the case. However, in fairness to the State Department, and the Department of Justice, our court has not heretofore invited their comment on this issue.

. The majority contends that it is 'premature” to consider whether Spain is a good faith purchaser. Maj. op. at 1031 n.15. Yet we must consider whether Congress intended to waive the sovereign immunity of such a good faith purchaser, since Cassirer does not allege in the complaint that Spain acquired the painting in bad faith or in violation of international law. Cassirer alleges at most that Spain has “wrongfully detained” the painting after the Nazis took the painting in violation of international law. Nor are we to rely simply on the allegations in the complaint to determine subject matter jurisdiction. We must instead look to facts outside the pleadings to determine whether we have jurisdiction. Robinson v. United States, 586 F.3d 683, 685 (9th Cir.2009) ("No presumptive truthfulness attaches to plaintiff's allegations. Once challenged, the party asserting subject matter jurisdiction has the burden of proving its existence.”) (citations omitted); see also McCarthy v. United States, 850 F.2d 558, 560 (9th Cir.1988) ("[W]hen considering a motion to dismiss pursuant to Rule 12(b)(1) the district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction.”); Charles Alan Wright & Arthur R. Miller, 5B Federal Practice and Procedure § 1350 (3d ed.2004). We know of no such facts in the record showing that Spain has itself taken the painting in violation of international law.