**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
           *Plaintiff-Appellant,*

           v.

CHING TANG LO, aka Jeff Lo,
           *Defendant-Appellee.*

No. 03-50608

D.C. No.
CR-02-00419-ER

UNITED STATES OF AMERICA,
           *Plaintiff-Appellee,*

           v.

CHING TANG LO, aka Jeff Lo,
           *Defendant-Appellant.*

No. 04-50223

D.C. No.
CR-00419-ER-1

OPINION

Appeal from the United States District Court
for the Central District of California
Edward Rafeedie, District Judge, Presiding

Argued and Submitted
November 16, 2005—Pasadena, California

Filed May 19, 2006

Before: Procter Hug, Jr. and Kim McLane Wardlaw,
Circuit Judges, and James K. Singleton,* District Judge.

Opinion by Judge Hug

*The Honorable James K. Singleton, United States District Judge for
the District of Alaska, sitting by designation.

**COUNSEL**

Michael J. Raphael, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellant/cross-appellee.

Benjamin L. Coleman, San Diego, California, for the defendant-appellee/cross-appellant.

**OPINION**

Hug, Circuit Judge:

The Government appeals the district court's order granting defendant Ching Tang Lo's motion for acquittals on a charge of possessing ephedrine, a listed chemical used to manufacture methamphetamine, and a related money laundering charge. Lo contends that this court does not have jurisdiction to consider this appeal and that there was insufficient evidence to support the verdicts. We hold that we do have jurisdiction to consider the Government's appeal and that there was sufficient evidence to support the jury's verdicts. We therefore reverse the district court's order granting the acquittals.

Lo cross-appeals the district court's denial of his motion for a judgment of acquittal on the charge of conspiracy. He contends that the district court erred by denying the motion because the jury acquitted Leslie Kuan, the only other charged co-conspirator, and because there was no evidence that he conspired with anyone besides government agents. We hold

that there was sufficient evidence that Lo conspired with Kuan to achieve all four of the charged objects of the conspiracy and that Lo's conviction may be based on this evidence even though the jury acquitted Kuan of conspiracy.

We also reject Lo's claim that the district court committed plain error by giving incorrect jury instructions regarding the *mens rea* required for violation of 21 U.S.C. § 841(c)(2) and by failing to provide complete jury instructions for the aiding and abetting objects of the conspiracy charge.

Finally, Lo appeals his sentence. He argues that *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005) overruled *United States v. Buckland*, 289 F.3d 558 (9th Cir. 2002) (en banc), and that it was therefore error for him to be subject to the mandatory minimum sentences contained in 21 U.S.C. § 841(b). We reject this argument and hold that Lo is subject to those mandatory minimum sentences. We conclude, however, that Lo is entitled to a limited remand for sentencing purposes pursuant to *United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (en banc).

## I.

## Factual and Procedural Background

### A.   *The Offense*

This case concerns two listed chemicals. One listed chemical, 3,4-methylenedioxyphenyl-2-propanone ("MDP-2-P") is used to manufacture the controlled substance 3,4-methylenedioxymethamphetamine ("MDMA" or "Ecstacy"). Ma huang is a plant that is also known as ephedra. Ma huang contains ephedrine, a listed chemical used in the manufacture of methamphetamine, a controlled substance.

In December 2001, an informant told a government agent that Lo previously had sold him precursor chemicals used to

manufacture a variety of controlled substances. Lo had sold the informant very large quantities of ephedrine pills, iodine products, and an oil base for Ecstasy. The informant purchased these chemicals and resold them for the purpose of manufacturing illegal drugs such as Ecstasy, speed, and "ice."

This information prompted government agents to initiate a series of meetings with Lo, which the agents monitored. On January 7, 2002, Lo gave price quotes to the informant for bags of iodine and ephedrine barrels or bags. Lo said that he was having trouble bringing the ephedrine into the United States from Mexico. On January 15, 2002, Lo provided the informant with a sample containing MDP-2-P, which the informant then gave to government agents.

On February 16, 2002, the informant introduced Lo to an undercover officer who was posing as a methamphetamine manufacturer. At that meeting, Lo asked the officer to manufacture one million tabs of Ecstasy for him. In addition, at that meeting, and again at a later meeting, Lo agreed to provide the chemicals for the manufacture of Ecstasy as well as ephedrine for the manufacture of methamphetamine. On March 13, 2002, Lo provided the informant with a box containing MDP-2-P. On April 4, 2002, Lo, with his ex-wife Leslie Kuan, met with a government agent to discuss the status of the manufacturing process for the Ecstasy and to discuss the estimated delivery date for the Ecstacy.

Lo obtained barrels of ma huang extract from a company called Essential Pharmaceuticals. The ma huang extract was obtained from the ma huang plant and contained approximately eight percent ephedrine, a higher concentration of ephedrine than the unprocessed ma huang plant contains. A company employee testified that he delivered barrels of ma huang extract to both Lo and Kuan. He also testified that he saw Kuan and Lo remove labels from the barrels of ma huang extract with a knife or blade. On April 11, 2002, officers observed Lo and Kuan unloading barrels and large trash bags

of ma huang extract into a storage locker. The following day, officers observed Lo and Kuan loading barrels of ma huang extract into a van outside of the Essential Pharmaceuticals company. On that same day, officers executed a search warrant on Lo's storage locker and found 230 barrels of ma huang extract, which a field test showed tested positive for ephedrine. Officers found an additional 40 barrels of the ma huang extract at the defendant's home. Agents later found 297 more barrels of ma huang extract at another storage locker registered to Kuan and Lo. Invoices showed that a pharmaceutical company delivered 32,675 kilograms (1,307 barrels) of ma huang extract to Lo and Kuan at a total supplier's cost of $272,367.50.

## B. The Indictment

In the first amended superseding indictment, Count One charged Lo and Kuan and others known and unknown with conspiring to commit the following offenses: 1) To distribute ephedrine, a listed chemical, knowing and[1] having reasonable cause to believe that the ephedrine would be used to manufacture a controlled substance, methamphetamine, in violation of 21 U.S.C. § 841(c)(2); 2) To aid and abet the manufacture of more than 500 grams of a mixture or substance containing a detectable amount of methamphetamine, a controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; 3) To distribute MDP-2-P, a listed chemical, knowing and having reasonable cause to believe that the MDP-2-P would be used to manufacture Ecstacy, a controlled substance, in violation of 21 U.S.C. § 841(c)(2); and 4) To aid and abet the manufacture of Ecstasy, a controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Count Two charged Lo with violating 21 U.S.C.

---

[1]Although the statute itself requires knowledge "*or* reasonable cause to believe," *see* 21 U.S.C. § 841(c)(2) (emphasis added), the indictment repeatedly used the word "and," not "or."

§ 841(c)(2) by knowingly and intentionally distributing MDP-2-P, a listed chemical, knowing and having reasonable cause to believe that the MDP-2-P would be used to manufacture MDMA, a controlled substance.

Count Three charged Lo and Kuan with violating 21 U.S.C. § 841(c)(2) by knowingly and intentionally possessing MDP-2-P, a listed chemical, knowing and having reasonable cause to believe that the MDP-2-P would be used to manufacture Ecstasy, a controlled substance.

Count Four charged Lo and Kuan with violating 21 U.S.C. § 841(c)(2) by knowingly and intentionally possessing ephedrine, a listed chemical, knowing and having reasonable cause to believe that the ephedrine would be used to manufacture methamphetamine, a controlled substance.

Count Five charged Lo with violating 18 U.S.C. § 1957 by using money obtained from the unlawful distribution of ephedrine to buy a Lexus coupe.

Lo also was charged and acquitted of other counts not relevant to this appeal.

## C.   District Court Proceedings

Lo and Kuan were tried beginning on July 15, 2003. At trial, the defendants and the Government both presented expert testimony regarding the contents of the ma huang extract, the extraction of ephedrine from ma huang, and the use of ephedrine in the manufacture of methamphetamine.

Lo testified at trial. He admitted that he provided the informant with 5 gallons of "oil" (MDP-2-P) on March 13, 2002, and that he told the informant that the oil was worth $200,000. He also admitted that he had called the informant to ask when the Ecstasy pills were going to be ready because he was under a lot of pressure. In addition, he admitted that

he agreed to provide the agents with ephedrine as part of his payment for the Ecstasy.

Lo claimed that he never intended to get involved in making Ecstasy and that he was only trying to swindle buyers rather than enabling them to make drugs. He testified that he never intended for the ephedrine to be extracted from the ma huang extract and made into methamphetamine. Instead, he claimed, he wanted to cheat people by selling them ma huang instead of ephedrine.

On July 25, 2003, the jury returned its verdicts, convicting Lo on counts One through Five of the indictment and acquitting Kuan on all counts. Pursuant to Rule 29 (c) of the Federal Rules of Criminal Procedure, Lo then moved for a judgment of acquittal notwithstanding the verdict on Count One, which charged him with conspiracy, and Counts Four and Five, which charged him with possession of ephedrine and related money laundering. The court denied the motion for Count One, but granted the motion for Counts Four and Five. Both parties moved for reconsideration. The judge denied both motions.

On April 20, 2004, the district court sentenced Lo to 235 months imprisonment. He also sentenced Lo to five years of supervised release on Count One and three years of supervised release on Counts Two and Three, to be served concurrently.

## II.

### A. Appellate Jurisdiction to Review the Acquittals

Lo contends that we do not have jurisdiction to consider the Government's appeal of the district court's order granting the motion for acquittals on Counts Four and Five. Section 3731 of the Criminal Code provides:

> In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information or granting a new trial after verdict or judgment, as to any one or more counts, or any part thereof, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.

18 U.S.C. § 3731.

**[1]** Lo claims that section 3731 does not authorize the Government to appeal a district court order granting a judgment of acquittal. He acknowledges that we ruled in *United States v. Sharif*, 817 F.2d 1375, 1376 (9th Cir. 1987), that we do have jurisdiction to consider a government appeal of a district court's order granting a judgment of acquittal after a jury has returned a guilty verdict. Nevertheless, Lo argues that the plain language of section 3731 does not mention acquittals and that, as a result, section 3731 does not provide jurisdiction for appeals from acquittals. He therefore requests that this panel call for *en banc* review and overturn cases such as *Sharif*.

**[2]** It is true that the language of section 3731 does not mention acquittals and that *Sharif* did not discuss the plain language of the statute, addressing only a Double Jeopardy argument. However, the *Sharif* court relied in part upon the Supreme Court's decision in *United States v. Wilson*, 420 U.S. 332 (1975). *See Sharif,* 817 F.2d at 1376. Lo attempts to distinguish *Wilson* on the ground that *Wilson* involved the dismissal of an indictment rather than an acquittal, and the language of section 3731 *does* include dismissing indictments. In fact, though, the Supreme Court did not rest its decision in *Wilson* on a conclusion that the district court had dismissed the indictment.

In *Wilson*, the defendant was found guilty by a jury. 420 U.S. at 334. Following the verdict, the district court dismissed the indictment on the ground that preindictment delay was unreasonable and had substantially prejudiced the defendant's right to a fair trial. *Id.* The government sought to appeal the dismissal pursuant to section 3731. *Id.* at 335. The Court of Appeals found that the district court's ruling was in effect an acquittal, but concluded that the government could not appeal the acquittal because of the Double Jeopardy Clause. *Id.*

**[3]** Significantly, the Supreme Court found it unnecessary to determine whether the district court actually had granted an acquittal or had dismissed an indictment. *See id.* at 336-39. Examining the legislative history of section 3731, the Court concluded that the Senate Report "indicated that the Judiciary Committee intended to extend the Government's appeal rights to the constitutional limits." *Id.* at 339. After examining the legislative history, the Court concluded that "it seems inescapable that Congress was determined to avoid creating non-constitutional bars to the Government's right to appeal." *Id.* at 340. The Court therefore held that the district court's order was appealable unless there was a constitutional bar to the appeal, implicitly ruling that section 3731 authorizes appeals from a court's grant of acquittal unless the appeal is barred by the Constitution. *Id.* The Court then went on to hold that "when a judge rules in favor of the defendant after a verdict of guilty has been entered by the trier of fact, the Government may appeal from that ruling without running afoul of the Double Jeopardy Clause." *Id.* at 353-54.

**[4]** Thus, Supreme Court precedent establishes that we do have jurisdiction when a district court grants an acquittal after a jury reaches a guilty verdict. We are bound by this precedent, and we therefore have jurisdiction to consider the Government's appeal of the district court's order granting Lo's motion for acquittals following the jury verdicts.

## B.  Possession of Ephedrine

The jury found Lo guilty of violating section 841(c)(2)[2] by possessing ephedrine knowing, or having reasonable cause to believe, that the ephedrine would be used to manufacture a controlled substance. Following the verdict, however, the judge granted acquittals on this count and the related Count Five. The judge reasoned that Lo possessed ma huang, not ephedrine, and that the defendant's expert showed that extracting ephedrine from ma huang extract required a laborious process. The Government argues that there was sufficient evidence for the jury to find that Lo possessed ephedrine because the ma huang extract seized from Lo contained ephedrine.

We review *de novo* the district court's grant of a Fed. R. Crim. P. 29(c) acquittal motion. *United States v. Martinez*, 122 F.3d 1161, 1163 (9th Cir. 1997). "A judgment of acquittal is improper if, viewing the evidence in the light most favorable to the government, a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Alston*, 974 F.2d 1206, 1210 (9th Cir. 1992).

[5] Both parties primarily rely upon our decision in *United States v. Daas*, 198 F.3d 1167 (9th Cir. 1999), to support their arguments. The parties differ, however, in their interpretations of that case, and they present different tests for determining when a chemical that is combined with other substances is considered a "listed chemical." We hold that, in order for a chemical that is commingled with other substances to be considered a listed chemical for purposes of section 841(c), the

---

[2]Section 841(c)(2) penalizes "[a]ny person who knowingly or intentionally — possesses or distributes a listed chemical knowing, or having reasonable cause to believe, that the listed chemical will be used to manufacture a controlled substance except as authorized by this subchapter." 21 U.S.C. § 841(c)(2). "Ephedrine, its salts, optical isomers, and salts of optical isomers" are listed chemicals. 21 U.S.C. § 802(34)(C).

chemical must: 1) maintain its distinct chemical identity within the combination rather than changing into a different chemical; and 2) must maintain its utility in the manufacture of a controlled substance.

## 1.   *Maintaining a Distinct Chemical Identity*

In *Daas*, we considered whether products that include ephedrine may be considered "list I chemicals" for purposes of 21 U.S.C. § 802 (34). *Daas*, 198 F.3d at 1173-79. Daas was convicted of distributing listed chemicals with reasonable cause to believe they would be used to manufacture methamphetamine. *Id.* at 1171. Daas sold large quantities of two brands of over-the-counter decongestants to convenience stores. *Id.* These products contained ephedrine and pseudoephedrine, but also contained other ingredients such as binders and an expectorant. *Id.* Daas argued that section 841(d)(2) criminalized only the distribution of pure ephedrine and pseudoephedrine. *Id.* We disagreed and held that the plain meaning of "listed chemical" included the ephedrine found in the over-the-counter products Daas sold. *Id.* at 1175.

In holding that the ephedrine and pseudoephedrine contained in the over-the-counter products were listed chemicals, we noted that the ephedrine and pseudoephedrine in the products retained a separate existence. *Id.* As part of our analysis, we determined that the over-the-counter products were "mixtures" containing extractable ephedrine and pseudoephedrine. *Id.* The fact that the products were mixtures was significant because, by definition, a mixture's components retain a separate existence; we defined a "mixture" as " 'a portion of matter consisting of two or more components[3] that do not bear a

---

[3]Lo contends that the Government was required to prove that all the ma huang extract components other than the ephedrine functioned solely as a carrier medium or packaging material. *Daas* provides no support for such a contention. Nowhere in *Daas* did we suggest that the other components combined with the ephedrine must function as a carrier medium or pack-

fixed proportion[4] to one another and that however thoroughly commingled are regarded as retaining a separate existence." *Id.* at 1174-75 (quoting *Chapman v. United States*, 500 U.S. 453, 461 (1991)).

[6] In contrast, we explained that a "chemical compound" is something that "necessarily implies not a mere mingling of components but a chemical combination of them, resulting in their destruction as distinct entities and in the development of a new substance possessing properties radically different from those of its constituent elements." *Id.* at 1175 (internal quotation omitted). It makes sense that a substance may not be considered a listed chemical merely because it is capable of reacting with other substances to produce a listed chemical. Just as possession of a listed chemical that can be used to manufacture a controlled substance is not sufficient to prove possession of a controlled substance, possession of a precursor to a listed chemical is not sufficient to prove possession of the listed chemical. Congress did not criminalize the possession of all materials that are important to the manufacture of a controlled substance; the material must be one of the identified listed chemicals. *See* 21 U.S.C. § 841(c). Thus, the Government was required to prove that the ephedrine maintained a separate existence within the ma huang extract seized

---

aging material. In fact, we concluded in *Daas* that the substances other than the ephedrine and pseudoephedrine that were contained in the over-the-counter products were "irrelevant." *Daas*, 198 F.3d at 1175. We reached this conclusion partly because the ephedrine and pseudoephedrine did not disappear or become different chemicals when added to the other substances. *Id.*

[4]Relying on *Daas*, Lo argues that the prosecution was required to prove that the ephedrine did not bear a fixed proportion to the other components in the ma huang extract. However, the *Daas* court did not even discuss whether there was a fixed proportion when it reached the conclusion that the ephedrine contained in the pills was a listed chemical. Although evidence regarding a lack of fixed proportions might be useful in proving that a chemical maintained its separate identity within a combination of substances, such evidence regarding proportions is not required.

from Lo. It would not have been sufficient if the ma huang extract was a precursor material that could be used to create ephedrine.

During the trial and other proceedings before the district court, Lo never argued that the ephedrine did not maintain a separate identity within the ma huang extract and he did not introduce any evidence that would support a finding that the ephedrine did not maintain a separate existence within the ma huang extract. Although Lo's expert questioned exactly how much ephedrine could be extracted from the ma huang extract, he never contested the fact that the ma huang extract seized from Lo contained ephedrine. Nevertheless, on appeal, Lo argues that there was insufficient evidence that the ephedrine retained a separate existence within the ma huang extract.

[7] Examining the evidence in the light most favorable to the Government, we hold that there was sufficient evidence that the ephedrine maintained a separate existence within the ma huang extract. The Government expert, a chemist, testified that the ma huang extract contained approximately 8% ephedrine. When asked how she reached this conclusion, she testified that she performed high performance liquid chromatography ("HPLC"). She explained that HPLC "basically quantitates how much sample is present in your second sample, how much pure sample is in there," and she further explained that, by "pure sample," she was referring to ephedrine.

The district court concluded that the Government had merely proved that the ma huang could be changed into ephedrine through a chemical process. The judge apparently was basing this conclusion on the HPLC testing process. In order to conduct the HPLC analysis, the Government expert dissolved the ma huang extract in alcohol. There was no evidence at all, however, that there was a chemical reaction that resulted in the production of ephedrine. The Government expert testified that she was merely diluting the ma huang

extract in the alcohol and that she also could have performed this procedure using water instead of alcohol. She repeatedly testified that the ma huang extract contained ephedrine, not that the ma huang extract could be used as an ingredient to make ephedrine. Not surprisingly, in a field test, the ma huang extract seized from Lo tested positive for ephedrine.

**[8]** Testimony by other experts also supports the jury's verdict. A DEA agent with specialized training in clandestine drug laboratories testified that ma huang contains ephedrine. Lo's own expert testified that the ma huang extract he tested was like other ma huang extract that contained 8% ephedrine. He also testified that the assay showing the ephedrine content in the ma huang extract "is a determination of how much some material of interest is contained in some sample, like silver in a silver dollar." In addition, he testified that ephedrine had been extracted from ma huang and that an "extraction process is a removal of something from something else; a pulling out." All of this testimony provides sufficient evidence that the ephedrine maintained its existence within the ma huang extract and was not merely subsequently derived from a chemical reaction with the ma huang extract.

2.   *Utility of the Ephedrine in the Production of Methamphetamine*

Lo contends that the Government was required to prove that ephedrine easily could be extracted from the ma huang extract and used to manufacture methamphetamine, and he further contends that the Government failed to provide sufficient evidence of these facts. Although the *Daas* court did conclude that the ephedrine in that case was "easily extractable" from the cold tablets, the court did not rule that easy extraction was *required*. *Daas*, 198 F.3d at 1175. The *Daas* court directed its analysis toward determining whether combining the ephedrine with other substances affected the utility of the ephedrine. *See id.* Given the legislative scheme at issue, such an analysis makes sense. If the chemical that is mingled

with other substances cannot ever be used to manufacture a controlled substance, there cannot be a violation of the statute; the reason for statutorily identifying chemicals as listed chemicals is to prevent their use in the manufacture of controlled substances. Section 802(34) defines a list I chemical as a "chemical that is used in manufacturing a controlled substance." 21 U.S.C. § 802(34). Thus, if the ephedrine in the ma huang extract cannot be used to manufacture a controlled substance, then it cannot be considered a listed chemical.

**[9]** The fact that it is *difficult* to use a particular chemical to manufacture a controlled substance, however, does not mean that the chemical cannot or will not be used in the manufacture of controlled substances. Drug sales can be extremely lucrative and the selling price of a controlled substance may make it worth the effort and cost to engage in a difficult process to be able to manufacture the drug. Thus, a person is not exempt from prosecution for possession of a listed chemical simply because combining the chemical with other substances makes it difficult to use the chemical to manufacture a controlled substance.

**[10]** For example, DEA regulations exempt unaltered[5] ma huang plant material and other ma huang products with relatively low concentrations of ephedrine from certain registration and record-keeping requirements concerning the sale and importation of listed chemicals. *See* 21 C.F.R. § 1310.12(c), (d)(1). Nevertheless, the regulations explicitly state that an exemption from the record keeping and reporting regulations

---

[5]The ma huang extract at issue in this case would not qualify for such an exemption. The exemption for plant material is limited to plant material that preserves the natural constituents in ratios that are found in the plant's natural state. 21 C.F.R. § 1310.12(d)(1). The regulation explicitly states that "[p]lant material subjected to chemical or physical extraction, concentration, chemical reaction, or other treatment that alters the plant's natural constituents or the ratios of the plant constituents are not exempt." *Id.* This kind of extracted and concentrated material is precisely the kind of material at issue in the instant case.

does *not* affect "the criminal liability for illegal possession, distribution, exportation, or importation of listed chemicals contained in the exempt chemical mixture." 21 C.F.R. § 1310.12(b). Therefore, in a case such as the instant one, where the ephedrine concentration in the ma huang extract is too high for the extract even to qualify for an exemption from the registration and record keeping requirements,[6] criminal

---

[6]The DEA established the concentration limit based on its concern that exempted chemical mixtures, including ma huang, were providing drug traffickers with an unregulated source for obtaining listed chemicals. *See* 68 Fed. Reg. 23195, 23196 (May 1, 2003). The DEA was aware that ma huang and ma huang extracts containing ephedrine had been seized from clandestine methamphetamine laboratories. *See id.* at 23198. The DEA explicitly noted: "DEA studies confirm that the ephedrine contained in such extracts and some dietary supplement products can be readily recovered and can be easily used in the production of methamphetamine." *Id.* Thus, the DEA concluded that "Ephedra (in the form of dietary supplements or bulk ephedra extract), therefore, can and is being used as the source of precursor material for the illicit production of methamphetamine." *Id.*

At first, the DEA responded to these concerns by proposing regulating ma huang products, including ma huang extracts, whenever the percentage of ephedrine exceeded 2%. *Id.* at 23199. However, members of the dietary supplement industry protested that the regulations would be too burdensome and that their products were not likely to be used to manufacture methamphetamine; therefore, they suggested limiting the regulation of ma huang products to products containing more than 6% ephedrine. *Id.* at 23199-200. Recognizing that a 2% limit would create a significant regulatory burden, the DEA agreed to raise the concentration limit above 2%. *Id.* at 23195.

However, the DEA agreed to raise the concentration limit only to 5% because it believed that higher concentrations of bulk ephedra extracts are practical sources for a methamphetamine precursor. *Id.* at 23200. Thus, the DEA concluded that the 5% concentration limit was "expected to exempt the vast majority of dietary supplements containing ephedrine/ pseudoephedrine *while allowing bulk ephedra extract to be treated as a regulated chemical*." *Id.* (emphasis added). This 5% limit is now contained in 21 C.F.R. § 1310.12(c). The uncontradicted testimony in Lo's case was that the ma huang extract seized from him was an extract that contained 8% ephedrine. Therefore, the ma huang extract seized from Lo would not qualify for the regulatory exemption.

liability certainly should be possible even if it is not easy to extract the ephedrine and use it to manufacture methamphetamine.

There was sufficient evidence in the record from which a reasonable juror could find that the ephedrine in the ma huang extract seized from Lo could be used to manufacture methamphetamine. The Government's expert witness, a chemist, testified that she extracted ephedrine from the ma huang extract seized from Lo and that one could use the ephedrine in the ma huang extract to manufacture methamphetamine. She also testified about an alternate method that could be used to extract the ephedrine from the ma huang extract and that this ephedrine could be used to make methamphetamine. In addition, the DEA special agent, who had specialized training in clandestine drug laboratories, testified that ephedrine is used to manufacture methamphetamine.

[11] Even Lo's own expert testified about articles he had read in which people had extracted ephedrine from ma huang. He also testified that he found a method where he could successfully extract ephedrine from ma huang extract and he did, in fact, extract ephedrine oxylate, an ephedrine salt that is a listed chemical. Thus, although Lo's expert testified that it would be difficult to extract the ephedrine and manufacture methamphetamine, there was sufficient evidence for a jury to find that the ephedrine in the ma huang extract could be used to manufacture methamphetamine.

[12] Because we hold that there was sufficient evidence that the ephedrine maintained its separate identity within the ma huang extract and that it could be used to manufacture methamphetamine, we reverse the district court's grant of acquittals on Counts Four and Five.

## C. Conspiracy

Lo was tried for conspiring to achieve four objects of the conspiracy: 1) to distribute ephedrine, knowing or having rea-

sonable cause to believe the ephedrine would be used to manufacture a controlled substance; 2) to aid and abet the manufacture of methamphetamine; 3) to distribute MDP-2-P, knowing or having reasonable cause to believe the MDP-2-P would be used to manufacture a controlled substance; and 4) to aid and abet the manufacture of Ecstacy. In a special verdict, the jury convicted Lo of conspiring to achieve all four objects of the conspiracy. The jury acquitted Kuan of conspiracy. Following the verdict, the district court denied Lo's motion for an acquittal on the conspiracy conviction and then denied Lo's motion for reconsideration. Lo appeals, claiming that there was insufficient evidence to support a conviction for conspiracy.

We review *de novo* the denial of a motion for a Fed. R. Crim. P. 29(c) acquittal, examining the evidence in the light most favorable to the Government to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Pacheco-Medina*, 212 F.3d 1162, 1163 (9th Cir. 2000).

## 1.  Lo's Co-Conspirator

Lo contends that there was insufficient evidence to support the conspiracy conviction because most of his interactions were with undercover operatives. It is true that the agreement in a conspiracy cannot be established with evidence that the defendant had an agreement with a government informer.[7] *See United States v. Escobar de Bright*, 742 F.2d 1196, 1198-2000 (9th Cir. 1984). The question, therefore, is whether there was sufficient evidence to find a conspiracy with someone other than government agents and informants.

---

[7]In fact, the judge instructed the jury as follows: "Before being convicted of a conspiracy, an individual must conspire with at least one coconspirator. There can be no conspiracy when the only person with whom the defendant allegedly conspired was a government informer who secretly intended to frustrate the conspiracy."

Lo also argues that any conviction for conspiracy cannot be based on a theory that the convicted person conspired with someone whom the jury acquitted of conspiracy. Therefore, because the jury acquitted Kuan of conspiracy, Lo claims that we may not rely on evidence of an agreement with Kuan to find sufficient evidence that he committed conspiracy.

[13] Lo's argument has no merit. It is well established that a person may be convicted of conspiring with a co-defendant even when the jury acquits that co-defendant of conspiracy. *United States v. Valles-Valencia*, 823 F.2d 381, 382 (9th Cir. 1987), *modifying* 811 F.2d 1232 (9th Cir. 1987). Indeed, in *Valles-Valencia*, we affirmed[8] a conspiracy conviction even though there was insufficient evidence that the convicted conspirator conspired with anyone other than people whom the jury acquitted of conspiracy. *Id.* at 382, *modifying* 811 F.2d at 1239; *see also United States v. Hughes Aircraft Co.,* 20 F.3d 974, 977-78 (9th Cir. 1994) (affirming conspiracy conviction where "indispensable co-conspirator" was acquitted of conspiracy on identical evidence); *United States v. Ayers*, 924 F.2d 1468, 1483 (9th Cir. 1991) (affirming conspiracy conviction and concluding that "the acquittal of all conspirators but one does not necessarily indicate that the jury found no agreement" with the acquitted co-conspirators). As a result of this

---

[8]In *Valles-Valencia*, we originally concluded that the appellant's conspiracy conviction had to be reversed because his co-conspirators had been acquitted of conspiracy. 811 F.2d at 1239. However, we then reconsidered our opinion in light of *United States v. Powell*, 469 U.S. 57 (1984). In *Powell*, the Supreme Court rejected a rule that had allowed defendants to challenge a conviction based on the fact that the conviction was inconsistent with the jury's other verdicts. *Powell*, 469 U.S. at 66. The Supreme Court reasoned that inconsistent verdicts do not necessarily lead to the conclusion that the guilty verdict was the incorrect verdict. *Id.* at 65. In *Valles-Valencia*, we relied upon *Powell* to conclude that "inconsistent verdicts can just as easily be the result of jury lenity as a determination of the facts. Thus, the acquittal of all conspirators but one does not necessarily indicate that the jury found no agreement to act." *Valles-Valencia*, 823 F.2d at 381-82. We therefore affirmed the conspiracy conviction based on an agreement with acquitted co-defendants. *Id.*

legal precedent, we must affirm Lo's conviction for conspiracy if there is sufficient evidence that he conspired with Kuan, even though the jury acquitted Kuan of conspiracy.

## 2.   *The Sufficiency of the Evidence*

To establish a drug conspiracy, the Government must prove: 1) an agreement to accomplish an illegal objective; and 2) the intent to commit the underlying crime. *United States v. Iriarte-Ortega*, 113 F.3d 1022, 1024 (9th Cir. 1997), *amended on denial of reh'g*, 127 F.3d 1200 (9th Cir. 1997). Proof of the agreement may be based on circumstantial evidence from which the jury may draw an inference of an agreement. *Id.* at 1024. Thus, a conspiracy may be proven by circumstantial evidence that the defendants acted together towards a common goal. *Id.*

Here, the crimes that were the alleged objects of the conspiracy were illegal distribution of listed chemicals and aiding and abetting the manufacture of controlled substances. Illegal distribution of a listed chemical in violation of section 841(c) requires knowingly distributing a substance that is a listed chemical knowing or having reasonable cause to believe that the listed chemical will be used to manufacture a controlled substance. 21 U.S.C. § 841(c)(2).

Aiding and abetting contains four elements:

> (1) that the accused had the specific intent to facilitate the commission of a crime by another, (2) that the accused had the requisite intent of the underlying substantive offense, (3) that the accused assisted or participated in the commission of the underlying substantive offense, and (4) that someone committed the underlying substantive offense.

*United States v. Garcia*, 400 F.3d 816, 818 n.2 (9th Cir. 2005) (citations and emphasis omitted).

**[14]** Section 841(a) prohibits "knowingly or intentionally" manufacturing a controlled substance. 21 U.S.C. § 841(a). As with unlawful possession under section 841(a), there is a criminal intent requirement for unlawfully manufacturing a controlled substance in violation of section 841(a), so knowledge that one is manufacturing an unlawful substance is a required element. *Cf. United States v. Lopez-Martinez*, 725 F.2d 471, 474 (9th Cir. 1984) (holding that to prove unlawful possession under section 841, the defendant must have knowledge that he possessed a controlled substance). Therefore, the charge of conspiracy to aid and abet the manufacture of a controlled substance requires a belief that the chemicals will be used to manufacture a controlled substance, not just reasonable cause to believe that the chemical will be used to manufacture controlled substances.

Examining the evidence in the light most favorable to the Government, we hold that there was sufficient evidence to support a verdict that Lo conspired with Kuan[9] to achieve the methamphetamine-related objects of the conspiracy. On January 15, 2002, surveillance agents saw Kuan loading barrels into vans and then unloading the barrels at a trash dump. The agent also testified that the barrels he observed looked like the seized barrels that contained ma huang extract. On April 11, 2002, Kuan helped Lo load approximately 18 heavy and large trash bags from a storage locker into a van. Kuan and Lo then took the van to their apartment and backed the van into the garage. On April 12, 2002, a special agent observed Kuan closing the door to her van with barrels inside of it. Kuan and Lo then took the barrels to the apartment and into the parking garage, where they then unloaded the barrels. Later that day, agents seized 40 barrels of ma huang extract from that location. The agents subsequently found 297 more barrels at another storage locker to which Kuan and Lo had joint access.

---

[9]The Government also claims that there is sufficient evidence to prove that Lo conspired with persons whose names are unknown, as charged in the indictment. Since we hold that there is sufficient evidence to find a conspiracy between Lo and Kuan, we need not reach this issue.

A witness from the pharmaceutical company testified that he delivered the barrels of ma huang extract to both Lo and Kuan. Even more significantly, that witness also testified that he saw both Kuan and Lo remove the identifying labels from the barrels of ma huang extract. Since possession of ma huang extract was not in and of itself illegal, this is compelling evidence that Kuan and Lo actually believed that the huge volume of ma huang extract they were hiding in storage units was going to be used to manufacture methamphetamine and that they were trying to hide their unlawful conduct. Thus, we hold that, viewing the evidence in the light most favorable to the Government, there was sufficient evidence that Lo and Kuan conspired to distribute ephedrine,[10] knowing or having reasonable cause to believe the ephedrine would be used to manufacture a controlled substance and that they conspired to aid and abet the manufacture of methamphetamine.

There also was sufficient evidence to support the jury verdicts relating to the Ecstasy related objects of the conspiracy. On April 11, 2002, agents saw Kuan come out of the apartment garage and give Lo a plastic bottle containing brown liquid. On April 12, 2002, agents seized from that same location a five-gallon box containing the brown liquid, which was MDP-2-P.

[15] Kuan also was present at a meeting in which Lo and others discussed the progress of the Ecstasy manufacturing, including the estimated date that the Ecstacy would be deliv-

---

[10]Lo argues that, at the very least, there was insufficient evidence regarding the object of distributing ephedrine because he agreed only to distribute ma huang, not ephedrine. There are two problems with this argument. First, as discussed above, there was sufficient evidence to find that the ma huang extract contained ephedrine. Second, Lo did not have to possess ephedrine to conspire to distribute ephedrine. Even if Lo possessed only ma huang extract and not ephedrine, there is sufficient evidence that he was part of a conspiracy where there was an agreement to ensure that ephedrine was obtained from the ma huang extract and distributed for purposes of manufacturing methamphetamine.

ered to Lo. Her presence was not mere happenstance; the agents had been informed ahead of time that she was going to attend the meeting. Examining the evidence in the light most favorable to the Government, there is sufficient evidence to support a verdict that Kuan and Lo conspired to distribute MDP-2-P, knowing or having reasonable cause to believe the MDP-2-P would be used to manufacture a controlled substance and that they conspired to aid and abet the manufacture of Ecstasy. Therefore, we affirm the district court's denial of Lo's motion for an acquittal on the conspiracy count.

## D. Jury Instructions

On appeal, Lo contends that a number of jury instructions were erroneous. At trial, Lo did not object to any of the jury instructions he now challenges. Therefore, we review the jury instructions for plain error. *See Jones v. United States*, 527 U.S. 373, 388 (1999). Under the plain error standard, the defendant must prove that: 1) there was error; 2) the error was plain; and 3) the error affected substantial rights. *United States v. Olano*, 507 U.S. 725, 732 (1993). Even if a defendant makes all three of these showings, a court should exercise its discretion to reverse a conviction only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings. *Id.* An error is not plain unless it "is so clear-cut, so obvious, a competent district judge should be able to avoid it without benefit of objection." *United States v. Turman*, 122 F.3d 1167, 1170 (9th Cir. 1997). Reversal on the basis of plain error is an exceptional remedy and an improper jury instruction rarely justifies reversal of a conviction for plain error. *United States v. Still*, 857 F.2d 671, 671-72 (9th Cir. 1988).

*1. The* Mens Rea *Jury Instructions for Possession of a Listed Chemical*

On the section 841(c)(2) count for possession of MDP-2-P, the district court instructed the jury as follows:

The defendants are charged in Count Three of the first amended superseding indictment with the possession of MDP-2-P.

In order for the defendant to be found guilty of that charge, the government must prove beyond a reasonable doubt : First, that the defendants knowingly possessed MDP-2-P; second, the defendants knowingly possessed it, knowing or having reasonable cause to believe that it would be used to manufacture a controlled substance.

It does not matter whether the defendants knew that MDP-2-P was a list chemical. It is sufficient that the defendants knew or had reasonable cause to believe that it would be used to manufacture a controlled substance or some other prohibited drug.

The jury instructions for Counts Two and Four were the same for all relevant purposes. Lo contends that it was plain error to give these jury instructions regarding *mens rea* because the instructions did not require the Government to prove that Lo knew that the substances were listed chemicals.

To determine what mental state is required to prove a violation of a statute, the court must look to the language of the statute and the intent of Congress. *United States v. Johal*, 428 F.3d 823, 826 (9th Cir. 2005). Where the language of the statute is not dispositive, the court looks to the congressional intent revealed in the history and purposes of the statutory scheme. *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 642 (1990).

**[16]** Section 841(c)(2) mandates punishment for "[a]ny person who knowingly or intentionally — possesses or distributes a listed chemical knowing, or having reasonable cause to believe, that the listed chemical will be used to manufacture

a controlled substance except as authorized by this chapter."
21 U.S.C. § 841(c)(2).

Lo argues that the jury instructions eliminate the first *mens rea* requirement, "knowingly," and therefore conflict with the plain language of section 841(c)(2). He apparently believes that the word "knowingly" plainly modifies the term "listed chemical" rather than modifying the term "possesses or distributes." It is not at all obvious from the statute's phrasing that knowingly applies to "listed chemical."

However, it also is not entirely clear from the grammar alone that "knowingly" does *not* modify both the phrase "possesses or distributes" and "listed chemical." In *Liparota v. United States*, 471 U.S. 419, 421 n.1 (1985), the Supreme Court considered a statute[11] that provided that "whoever knowingly uses, transfers, acquires, alters, or possesses coupons or authorization cards in any manner not authorized by this chapter or the regulations issued pursuant to this chapter shall, if such coupons or authorization cards are of a value of $100 or more, be guilty of a felony." The Government argued that the term "knowingly" applied only to the use, acquisition, transfer, alteration and possession part of the statute. *Id.* at 424. The defendant argued that "knowingly" required that the defendant know that the acquisition, use, transfer, or possession was in a manner not authorized by statute or regulation. *Id.* The Court concluded that either interpretation would accord with ordinary usage and noted that such ambiguity frequently exists in other contexts where, as a matter of grammar, the word "knowingly" could be interpreted in a variety of ways to modify several words or terms. *Id.* at 425 and 425 n.7.

Although the legislative history contained nothing that would clarify the congressional purpose, the *Liparota* Court

---

[11]The statute was the former 78 Stat. 708, as amended, 7 U.S.C. 2024(b)(1).

determined that the appropriate interpretation of the statute was to require proof that the defendant knew that his conduct was unauthorized by statute or regulation. *Id.* at 425-26. The Court reasoned that criminal offenses requiring no *mens rea* are generally disfavored and that "to interpret the statute otherwise would be to criminalize a broad range of apparently innocent conduct."[12] *Id.* at 427.

As in *Liparota*, at first blush, the grammar used in section 841(c)(2) may create some ambiguity here regarding which terms the word "knowingly" modifies. Nevertheless, Lo's case clearly is distinguishable from *Liparota*. First, unlike in *Liparota*, where the statute contained no *mens rea* requirement, there *is* a *mens rea* requirement in section 841(c)(2).[13]

---

[12]Similarly, the other cases on which Lo relies also created or extended statutory *mens rea* requirements based on the principles that criminal statutes usually should require criminal intent and statutes should be construed so that they do not lead to the absurd result of criminalizing seemingly innocent conduct. *See Arthur Andersen LLP v. United States*, 125 S. Ct. 2129, 2134-36 (2005) (holding that statutory term "knowingly" modified "corruptly persuades" because alternative interpretation would criminalize "innocent conduct"); *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 68-69 (1994) (holding that the use of "knowingly" in a child pornography distribution statute modified "the use of a minor" because some form of scienter was required for the criminal statute and the alternative interpretation would lead to the absurd result of punishing people who had no idea they even were dealing with sexually explicit material); *Staples v. United States*, 511 U.S. 600, 606, 608-14 (1994) (reading into statute that criminalized possession of a machine gun the requirement that the defendant know that the firearm is a machine gun because offenses that require no *mens rea* are disfavored and firearm owners otherwise might be subject to criminal penalties without even knowing their firearms had the illegal features).

[13]Lo essentially is asking this Court to read into the statute a provision that would exonerate a defendant who was ignorant about which substances were deemed listed chemicals under the law. However, even in cases where courts must read into a statute a *mens rea* requirement, that "*mens rea* presumption requires knowledge only of the facts that make the defendant's conduct illegal, lest it conflict with the related presumption, 'deeply rooted in the American legal system,' that, ordinarily, 'ignorance of the law or a mistake of law is no defense to criminal prosecution.' " *Staples v. United States*, 511 U.S. 600, 622 n.3 (1994) (Ginsburg, J. concurring) (quoting *Cheek v. United States*, 498 U.S. 192, 199 (1991)).

*See Johal*, 428 F.3d at 827 (holding that section 841(c)(2) requirement of knowledge or "reasonable cause to believe" imposes a *mens rea* requirement). This *mens rea* requirement ensures that apparently innocent conduct is not criminalized. *Id.* (rejecting argument that section 841(c)(2) puts unwitting store clerk at risk of going to prison simply for selling decongestants containing pseudoephedrine).

Second, unlike in *Liparota*, where the legislative history was unilluminating, the legislative history available for section 841(c)(2) indicates that Congress did not intend for the word "knowingly" to mean that the Government was required to prove that the defendant knew that the substance was a listed chemical. The current version of section 841(c)[14] resulted from an amendment of earlier statutory language. Congress substituted "possesses or distributes a listed chemical knowing, or having reasonable cause to believe, that the listed chemical will be used to manufacture a controlled substance except as authorized by this subchapter" for "possesses any piperidine knowing, or having reasonable cause to believe, that the piperidine will be used to manufacture phencyclidine except as authorized by this subchapter." Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690 § 6055(a)(1988). Thus, the word "knowingly" was in the earlier version of the statute that did not even mention listed chemicals. Therefore, it is unreasonable to conclude that, when Congress made the decision to include the word "knowingly" in the statute, it included that word in order to insert an additional requirement that people convicted under the statute know that the substance was a listed chemical.

**[17]** Moreover, it seems very unlikely that Congress would

---

[14]The current version of section 841(c) was denoted section 841(d) until the original section 841(c) was repealed. The original version of section 841(d), however, differed from what is now section 841(c). The amendment at issue here took place when the statutory provision still was denominated section 841(d)(2).

have chosen to make prosecution more difficult by requiring proof that the defendant knew that the chemical was a listed chemical, while at the same time seeking to expand the scope of prosecution for the possession and distribution of precursor chemicals by increasing the number of chemicals that could provide the basis for prosecution. Thus, the legislative history reveals that Congress did not intend to require that the Government prove that defendants knew that the chemicals they possessed were listed chemicals.

Lo argues that, to the extent the meaning of "knowingly" is unclear, the panel should apply the rule of lenity and adopt Lo's interpretation of the statute. However, "the rule of lenity is not to be applied where to do so would conflict with the implied or expressed intent of Congress." *Liparota*, 471 U.S. at 427. Here, the implied intent of Congress was that the word "knowingly" would not modify the term "listed chemical." Therefore, the rule of lenity does not apply.

**[18]** Because section 841(c)(2) does not require that defendants know that the substances they possess or distribute are listed chemicals, we hold that the district court did not err by providing the disputed *mens rea* instructions for the section 841(c)(2) counts.

### 2. *The Aiding and Abetting Jury Instructions*

Two of the alleged objects of the conspiracy were aiding and abetting the manufacture of controlled substances. Lo contends that the district court committed plain error when it failed to instruct the jury on the elements of aiding and abetting the manufacture of a controlled substance.

The judge's conspiracy instructions included the following instructions:

> The defendants are charged in Count One of the first amended superseding indictment with the crime of

conspiracy, conspiring to do one of four things — to violate the law in one of four ways: The first is to distribute ephedrine, a List I chemical, knowing *and* having reasonable cause to believe that the ephedrine would be used to manufacture a controlled substance, namely, methamphetamine, a Schedule II controlled substance. That's one of the alleged purposes of the conspiracy.

Number 2, it is alleged they conspired to aid and abet the manufacture of more than 500 grams of a mixture of a substance containing a detectable amount of methamphetamine, a Schedule II controlled substance.

The third law that they are alleged to have conspired to violate is to distribute MDP-2-P, which is a List I chemical, knowing *and* having reasonable cause to believe that the MDP-2-P would be used to manufacture a controlled substance, namely — the big long name here. But basically, it would be used to manufacture what is abbreviated as MDMA, a Schedule I controlled substance.

The fourth is the unlawful object of a conspiracy to aid and abet the manufacture of a controlled substance, namely, MDMA, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 846 and 841(a)(1).

The judge did not further explain the meaning of aiding and abetting while giving the conspiracy instructions. However, after providing instructions specifically relating to Counts Two, Three, and Four, the judge provided the jury with aiding and abetting instructions regarding the distribution and possession of listed chemicals.

Lo argues that the jury instructions constituted plain error because the jurors could not properly determine whether he

had the requisite intent to commit the crime unless they knew the *mens rea* elements of the underlying crime. The intent necessary to commit the underlying substantive offense is an essential element of a conspiracy, so jury instructions that erroneously construe the requisite intent for underlying offenses can cause the jury to misunderstand the intent required for the conspiracy count. *United States v. Kim*, 65 F.3d 123, 126 (9th Cir. 1995).

**[19]** The jurors in Lo's case could have extracted general aiding and abetting elements from the jury instructions on aiding and abetting the possession or distribution of listed chemicals and then applied those elements to the allegations of conspiracies to aid and abet the manufacture of controlled substances. The problem, however, was that the jury did not receive any instructions regarding the *mens rea* requirements for manufacturing a controlled substance in violation of section 841(a). This was an obvious error. Lo contends that the erroneous jury instructions regarding the conspiracy to aid and abet the manufacture of controlled substances affected the verdict. He argues that the only substantive offense instruction that the jury received in the conspiracy instructions was for the section 841(c)(2) distribution offense, which statutorily requires a *mens rea* requirement of "knowing, or having reasonable cause to believe." Therefore, Lo contends, the jury could have mistakenly relied upon the "reasonable cause to believe" standard and erroneously believed that Lo could be convicted of conspiring to aid and abet the manufacture of controlled substances even if he met only this lower *mens rea* standard.

The *mens rea* requirement of "reasonable cause to believe" presents an evidentiary burden very similar to actual knowledge. As we recently observed in *Johal*:

> [R]easonable cause to believe is not purely objective, but turns on the facts actually known by the defendant in a particular case — facts from which the jury

can infer that any reasonable person in the defendant's position would have had to know that the ingredients were being bought to make illegal drugs. As a practical matter, therefore, the differences between actual and constructive "knowledge" under the statute are not substantial.

*United States v. Johal*, 428 F.3d 823, 828 (2005) (emphasis omitted).

[20] In some cases, however, the slight difference in these standards might make a difference in the verdict. There is a complicating factor here, though, that makes the distinction between the standards irrelevant. When the judge instructed the jurors on the conspiracy charges and explained the distribution objects of the conspiracy, the judge actually used the phrase "knowing *and* having reasonable cause to believe" rather than "knowing *or* having reasonable cause to believe." Thus, when the jurors were considering the aiding and abetting objects of the conspiracy, if they mistakenly relied on the *mens rea* requirements from the distribution objects of the conspiracy, "knowledge" would have been the *mens rea* standard they applied. If anything, the burden arguably was higher in the instant case because the jurors may have concluded that the belief also had to be a *reasonable* one. Since the erroneous jury instructions did not lower the *mens rea* standard for conspiring to aid and abet the manufacture of controlled substances, the error did not affect Lo's substantial rights.

## E. Sentencing

The district court sentenced Lo based on an offense level of 38, with no departures or adjustments to the base offense level. The base offense level was a result of the quantity of ephedrine. The court concluded that, even using the more conservative drug quantity figures calculated by the defendant's expert, there would be 170 kilograms of ephedrine, which is far more than the three kilograms that results in the

base offense level of 38 pursuant to U.S.S.G. § 2D1.11(d)(1). The court sentenced Lo to 235 months, the very bottom of the 235-293 month range that applied to the total offense level of 38 and criminal history category I.

The court also sentenced Lo to five years of supervised release on Count One and three years of supervised release on Counts Two and Three, to be served concurrently. The five-year term of supervised release was a mandatory minimum term imposed pursuant to 21 U.S.C. § 841(b)(1)(A)(viii) because of the special verdict finding that Lo had conspired to aid and abet the manufacture of at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine. Based on that special verdict finding on the aiding and abetting object of the conspiracy, pursuant to 21 U.S.C. § 841(b), Lo also was subject to a mandatory minimum prison sentence of ten years, although the actual sentence far exceeded ten years. Lo makes multiple arguments regarding his sentencing.

### 1.   The Applicability of Section 841(b)

First, Lo contends that it was error for the district court to ask the jury to determine the amount of methamphetamine involved and that he therefore should not be subject to the mandatory minimum penalties contained in 21 U.S.C. § 841(b). He bases these arguments on his contention that the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), effectively overruled the Ninth Circuit's holding in *United States v. Buckland*, 289 F.3d 558 (9th Cir. 2002) (en banc), and that the penalty provisions contained in section 841(b) are unconstitutional and must be severed from the "unlawful acts" provisions contained in section 841(a).

In *Buckland*, the defendant challenged the constitutionality of 21 U.S.C. § 841(b)(1)(A). The jury convicted the defendant of possession of methamphetamine, but it was the judge who, applying a preponderance of the evidence standard, deter-

mined the amount of methamphetamine involved. *Id.* at 562-63. The judge sentenced him based on that quantity. *Id.* Buckland argued that section 841 was facially unconstitutional because it required a judge to determine the drug quantity and to apply a preponderance of the evidence standard. *Id.* at 563-64. The Government acknowledged that the judge should have submitted the question of drug quantity to the jury for a finding beyond a reasonable doubt, *id.* at 563, but urged us to resolve the problem through severance, *id.* at 564.

We determined that severance was unnecessary. *Id.* at 567. Relying on basic rules of statutory construction, we recognized that "if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid such problems." *Id.* at 564 (internal quotation marks and citations omitted). Examining the language of section 841, the court noted that the statute neither specified who would determine the drug quantity nor identified the appropriate burden of proof. *Id.* at 565. We therefore construed the language of section 841 as requiring that the drug quantity and type be charged in the indictment, submitted to the jury, subjected to the rules of evidence, and proved beyond a reasonable doubt. *Id.* at 568. As a result, we concluded that the statute was constitutional and there was no need to sever anything from the statute. *Id.* at 567.

Lo argues, however, that *Booker* essentially stands for the proposition that, whenever a sentencing provision can be interpreted to violate the Sixth Amendment, the appropriate judicial response is severance. Therefore, he claims, *Booker* requires severance of the enhanced penalty provisions contained in section 841(b).

*Booker* does not support this proposition. In *Booker*, the Supreme Court explained that "[i]f the Guidelines as currently written could be read as merely advisory provisions that rec-

ommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment." *Booker*, 543 U.S. at 233. However, the Court concluded that the language of the statute clearly made the Guidelines mandatory and binding on all judges. *Id.* The Court therefore concluded that the mandatory Guidelines violated the Sixth Amendment and then severed certain statutory provisions as a remedy. *Id.* at 244-68.

**[21]** Thus, in *Booker*, the Supreme Court resorted to severing some statutory provisions only because the statute could not be construed in a constitutional manner. As we found in *Buckland*, however, the penalty provisions in section 841(b) can reasonably be construed in a constitutional manner. *Booker* does nothing to change this. Therefore, we hold that Lo is subject to the mandatory minimums[15] for terms of imprisonment and supervised release contained in section 841(b).

*2.   Ameline* Remand

**[22]** Lo contends that he is entitled to a limited remand pursuant to *United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (en banc). Because Lo was sentenced under the then-mandatory Sentencing Guidelines and it is not clear from the record whether the court would have imposed a materially different sentence had it known that the Guidelines were only advisory, it is appropriate to remand to the sentencing court for a determination of whether that court would have imposed a different sentence. *See id.; see also United States v. Moreno-Hernandez*, 419 F.3d 906, 916 (9th Cir. 2005) (extending *Ameline*'s limited remand procedure to cases involving non-constitutional *Booker* errors).

---

[15]Lo contends that, if he is subject to the minimum sentence, in accordance with *Booker*, the minimum should be an advisory minimum, not a mandatory minimum. There is nothing in *Booker* to suggest that statutorily mandated minimum sentences are merely advisory if the sentence is based on facts found by a jury by a preponderance of the evidence.

**Conclusion**

We REVERSE the district court's grant of acquittals on Counts Four and Five and AFFIRM the district court's denial of Lo's motion for acquittal on Count One. We REMAND for reconsideration of Lo's sentence in accordance with *Ameline*.